# SPEVACK v. KLEIN.

No. 62. Argued November 7, 1966.—Decided January 16, 1967.

*Lawrence J. Latto* argued the cause for petitioner. With him on the briefs were *William H. Dempsey, Jr.,* and *Martin J. Flynn.*

*Solomon A. Klein,* respondent, *pro se,* argued the cause and filed a brief.

Briefs of *amici curiae,* urging reversal, were filed by *Israel Steingold,* for the American Trial Lawyers Association; *Herman B. Gerringer* for the New York State Association of Trial Lawyers; *Ralph Shapiro* for the New York City Chapter of the National Lawyers Guild; and by *Emanuel Redfield* for the New York Civil Liberties Union.

*John G. Bonomi* filed a brief for the Association of the Bar of the City of New York, as *amicus curiae,* urging affirmance.

MR. JUSTICE DOUGLAS announced the judgment of the Court and delivered an opinion in which THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE BRENNAN concur.

This is a proceeding to discipline petitioner, a member of the New York Bar, for professional misconduct. Of the various charges made, only one survived, *viz.,* the refusal of petitioner to honor a *subpoena duces tecum* served on him in that he refused to produce the demanded financial records and refused to testify at the judicial inquiry. Petitioner's sole defense was that the production of the records and his testimony would tend

to incriminate him. The Appellate Division of the New York Supreme Court ordered petitioner disbarred, holding that the constitutional privilege against self-incrimination was not available to him in light of our decision in *Cohen* v. *Hurley*, 366 U. S. 117. See 24 App. Div. 2d 653. The Court of Appeals affirmed, 16 N. Y. 2d 1048, 213 N. E. 2d 457, 17 N. Y. 2d 490, 214 N. E. 2d 373. The case is here on certiorari which we granted to determine whether *Cohen* v. *Hurley, supra,* had survived *Malloy* v. *Hogan,* 378 U. S. 1.

*Cohen* v. *Hurley* was a five-to-four decision rendered in 1961. It is practically on all fours with the present case. There, as here, an attorney relying on his privilege against self-incrimination refused to testify and was disbarred. The majority of the Court allowed New York to construe her own privilege against self-incrimination so as not to make it available in judicial inquiries of this character (366 U. S., at 125–127) and went on to hold that the Self-Incrimination Clause of the Fifth Amendment was not applicable to the States by reason of the Fourteenth. *Id.,* at 127–129. The minority took the view that the full sweep of the Fifth Amendment had been absorbed into the Fourteenth and extended its protection to lawyers as well as other persons.

In 1964 the Court in another five-to-four decision held that the Self-Incrimination Clause of the Fifth Amendment was applicable to the States by reason of the Fourteenth. *Malloy* v. *Hogan,* 378 U. S. 1. While *Cohen* v. *Hurley* was not overruled, the majority indicated that the principle on which it rested had been seriously eroded. 378 U. S., at 11. One minority view espoused by MR. JUSTICE HARLAN and MR. JUSTICE CLARK stated that *Cohen* v. *Hurley* flatly decided that the Self-Incrimination Clause of the Fifth Amendment was not applicable against the States (*id.,* at 17) and urged that it be fol-

lowed. The others in dissent—MR. JUSTICE WHITE and MR. JUSTICE STEWART—thought that on the facts of the case the privilege was not properly invoked and that the state trial judge should have been sustained in ruling that the answers would not tend to incriminate. *Id.*, at 33–38.

The Appellate Division distinguished *Malloy* v. *Hogan* on the ground that there the petitioner was not a member of the Bar. 24 App. Div. 2d, at 654. And the Court of Appeals rested squarely on *Cohen* v. *Hurley* as one of the two grounds for affirmance.[1]

And so the question emerges whether the principle of *Malloy* v. *Hogan* is inapplicable because petitioner is a member of the Bar. We conclude that *Cohen* v. *Hurley* should be overruled, that the Self-Incrimination Clause of the Fifth Amendment has been absorbed in the Fourteenth, that it extends its protection to lawyers as well as to other individuals, and that it should not be watered down by imposing the dishonor of disbarment and the deprivation of a livelihood as a price for asserting it. These views, expounded in the dissents in *Cohen* v. *Hurley*, need not be elaborated again.

We said in *Malloy* v. *Hogan*:

> "The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." 378 U. S., at 8.[2]

---

[1] "Order affirmed on the authority of *Cohen* v. *Hurley* (366 U. S. 117) and on the further ground that the Fifth Amendment privilege does not apply to a demand, not for oral testimony, but that an attorney produce records required by law to be kept by him (*Davis* v. *United States*, 328 U. S. 582; *Shapiro* v. *United States*, 335 U. S. 1)." 16 N. Y. 2d 1048, 1050, 213 N. E. 2d 457–458.

[2] *Kimm* v. *Rosenberg*, 363 U. S. 405, much relied on here, was a five-to-four decision the other way and accurately reflected the pre-

In this context "penalty" is not restricted to fine or imprisonment. It means, as we said in *Griffin* v. *California,* 380 U. S. 609, the imposition of any sanction which makes assertion of the Fifth Amendment privilege "costly." *Id.,* at 614. We held in that case that the Fifth Amendment, operating through the Fourteenth, "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.,* at 615. What we said in *Malloy* and *Griffin* is in the tradition of the broad protection given the privilege at least since *Boyd* v. *United States,* 116 U. S. 616, 634–635, where compulsory production of books and papers of the owner of goods sought to be forfeited was held to be compelling him to be a witness against himself.

> "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." 116 U. S., at 635.

*Malloy* v. *Hogan* construction of the Fifth Amendment. We do not stop to re-examine all the other prior decisions of that vintage to determine which of them, if any, would be decided the other way because of "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and *to suffer no penalty . . . for such silence,*" as declared in *Malloy* v. *Hogan, supra,* at 8. (Italics added.)

The threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a lawyer relinquish the privilege. That threat is indeed as powerful an instrument of compulsion as "the use of legal process to force from the lips of the accused individual the evidence necessary to convict him . . . ." *United States* v. *White,* 322 U. S. 694, 698. As we recently stated in *Miranda* v. *Arizona,* 384 U. S. 436, 461, "In this Court, the privilege has consistently been accorded a liberal construction." It is in that tradition that we overrule *Cohen* v. *Hurley.* We find no room in the privilege against self-incrimination for classifications of people so as to deny it to some and extend it to others. Lawyers are not excepted from the words "No person . . . shall be compelled in any criminal case to be a witness against himself"; and we can imply no exception. Like the school teacher in *Slochower* v. *Board of Education,* 350 U. S. 551, and the policemen in *Garrity* v. *New Jersey,*[3] *ante,* p. 493, lawyers also enjoy first-class citizenship.

The Court of Appeals alternately affirmed the judgment disbarring petitioner on the ground that under *Shapiro* v. *United States,* 335 U. S. 1, and the required records doctrine he was under a duty to produce the withheld records. The Court of Appeals did not elaborate on the point; nor did the Appellate Division advert to it. At the time in question the only Rule governing the matter was entitled "Preservation of records of actions, claims and proceedings."[4] It provided that in cases involving "contingent fee compensation" attorneys

---

[3] Whether a policeman, who invokes the privilege when his conduct as a police officer is questioned in disciplinary proceedings, may be discharged for refusing to testify is a question we did not reach.

[4] Rule 5 of the Special Rules of the Second Dept., Appellate Division. Rule 5 was subsequently amended and renumbered as Special Rule IV (6). See Civil Practice Annual of New York 9–24 (1964).

for all the parties shall preserve "the pleadings, records and other papers pertaining to such action, claim and proceeding, and also all data and memoranda of the disposition thereof, for the period of at least five years after any settlement or satisfaction of the action, claim or proceeding or judgment or final order thereon, or after the dismissal or discontinuance of any action or proceeding brought."

The documents sought in the subpoena were petitioner's daybook, cash receipts book, cash disbursements book, checkbook stubs, petty cashbook and vouchers, general ledger and journal, canceled checks and bank statements, passbooks and other evidences of accounts, record of loans made, payroll records, and state and federal tax returns and worksheets relative thereto.

The *Shapiro* case dealt with a federal price control regulation requiring merchants to keep sales records. The Court called them records with "public aspects," as distinguished from private papers (335 U. S., at 34); and concluded by a divided vote that their compelled production did not violate the Fifth Amendment. We are asked to overrule *Shapiro*. But we find it unnecessary to reach it.

Rule 5, requiring the keeping of records, was broad and general—"the pleadings, records and other papers pertaining to such action, claim and proceeding, and also all data and memoranda of the disposition thereof." The detailed financial aspects of contingent-fee litigation demanded might possibly by a broad, generous construction of the Rule be brought within its intendment. Our problem, however, is different. Neither the referee of the inquiry, nor counsel for the inquiry, nor the Appellate Division of the New York Supreme Court questioned the applicability of the privilege against self-incrimination *to the records*. All proceeded on the basis that petitioner could invoke the privilege with respect to the

records, but that the price he might have to pay was disbarment. The Court of Appeals was the first to suggest that the privilege against self-incrimination was not applicable *to the records.* Petitioner, however, had been disbarred on the theory that the privilege was applicable *to the records,* but that the invocation of the privilege could lead to disbarment. His disbarment cannot be affirmed on the ground that the privilege was not applicable in the first place. *Cole* v. *Arkansas,* 333 U. S. 196, 201. For that procedure would deny him all opportunity at the trial to show that the Rule, fairly construed and understood, should not be given a broad sweep [5] and to

---

[5] Counsel for respondent conceded on oral argument that the subpoena was broader than Rule 5:

"Q. Is this subpoena coextensive with the provisions of the order about keeping the financial records or does the subpoena go beyond?

"A. I would say in my judgment it goes beyond. . . . There is room for reasonable argument that some of the items called for in the subpoena might perhaps be argued to not come within the required records I am talking about.

"Q. Would you mind relating those to us? Tell us what those are. . . . Cash disbursements?

"A. I would say do come under the records. . . . I would exclude as not coming within the statute the federal and state tax returns for example. . . .

"Q. How about worksheets . . . ?

"A. Worksheets? Out. . . .

"Q. You mean all of item 12 . . . would be out?

"A. Item 12—copies of federal and state tax returns, accountants' worksheets, and all other . . . I do not include them.

"Q. They would all be outside the rules?

"A. Yes.

. . . . .

"Q. But the demand was for records beyond the records that he was required to keep.

. . . . .

"A. [T]he New York Court of Appeals, speaking for the State of New York, says these are required records.

"Q. I suppose that if he produced just the records that were re-

make a record that the documents demanded by the subpoena had no "public aspects" within the required records rule but were private papers.

*Reversed.*

MR. JUSTICE FORTAS, concurring in the judgment.

I agree that *Cohen* v. *Hurley,* 366 U. S. 117 (1961), should be overruled. But I would distinguish between a lawyer's right to remain silent and that of a public employee who is asked questions specifically, directly, and narrowly relating to the performance of his official duties as distinguished from his beliefs or other matters that are not within the scope of the specific duties which he undertook faithfully to perform as part of his employment by the State. This Court has never held, for example, that a policeman may not be discharged for refusal in disciplinary proceedings to testify as to his conduct as a police officer. It is quite a different matter if the State seeks to use the testimony given under this

---

quired—that he was required to keep—that that might very well constitute a waiver as to other records.

"A. No, no it would not. . . .

"Q. Why not?

"A. Because if the other records were held not to come within the required records doctrine he would have the privilege to do that, but he has no privilege.

"Q. I am not sure. Are you sure about that? . . . I would say that the common understanding is that if he produces some of the records relating to a given subject matter, that is a waiver of privilege as to the balance of the records relating to the subject matter. Am I wrong about that?

"A. I would not agree with that. It is an argument that could be made but I would disagree with it for this reason. Under the doctrine of *Shapiro* v. *United States,* he has no Fifth Amendment privilege as to records that are required to be kept. He does have Fifth Amendment privilege as to records he is not required to keep and also as to refusal to give oral testimony."

520

lash in a subsequent criminal proceeding. *Garrity* v. *New Jersey, ante,* p. 493.

But a lawyer is not an employee of the State. He does not have the responsibility of an employee to account to the State for his actions because he does not perform them as agent of the State. His responsibility to the State is to obey its laws and the rules of conduct that it has generally laid down as part of its licensing procedures. The special responsibilities that he assumes as licensee of the State and officer of the court do not carry with them a diminution, however limited, of his Fifth Amendment rights. Accordingly, I agree that Spevack could not be disbarred for asserting his privilege against self-incrimination.

If this case presented the question whether a lawyer might be disbarred for refusal to keep or to produce, upon properly authorized and particularized demand, records which the lawyer was lawfully and properly required to keep by the State as a proper part of its functions in relation to him as licensor of his high calling, I should feel compelled to vote to affirm, although I would be prepared in an appropriate case to re-examine the scope of the principle announced in *Shapiro* v. *United States,* 335 U. S. 1 (1948). I am not prepared to indicate doubt as to the essential validity of *Shapiro.* However, I agree that the required records issue is not appropriately presented here, for the reasons stated by my Brother DOUGLAS. On this basis I join in the judgment of the Court.

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK and MR. JUSTICE STEWART join, dissenting.

This decision, made in the name of the Constitution, permits a lawyer suspected of professional misconduct to thwart direct official inquiry of him without fear of disciplinary action. What is done today will be dis-

heartening and frustrating to courts and bar associations throughout the country in their efforts to maintain high standards at the bar.

It exposes this Court itself to the possible indignity that it may one day have to admit to its own bar such a lawyer unless it can somehow get at the truth of suspicions, the investigation of which the applicant has previously succeeded in blocking. For I can perceive no distinction between "admission" and "disbarment" in the rationale of what is now held. The decision might even lend some color of support for justifying the appointment to the bench of a lawyer who, like petitioner, prevents full inquiry into his professional behavior. And, still more pervasively, this decision can hardly fail to encourage oncoming generations of lawyers to think of their calling as imposing on them no higher standards of behavior than might be acceptable in the general marketplace. The soundness of a constitutional doctrine carrying such denigrating import for our profession is surely suspect on its face.

Six years ago a majority of this Court, in *Cohen* v. *Hurley,* 366 U. S. 117, set its face against the doctrine that now prevails, bringing to bear in support of the Court's holding, among other things, the then-established constitutional proposition that the Fourteenth Amendment did not make applicable to the States the Fifth Amendment as such. Three years later another majority of the Court, in *Malloy* v. *Hogan,* 378 U. S. 1, decided to make the Fifth Amendment applicable to the States and in doing so cast doubt on the continuing vitality of *Cohen* v. *Hurley.* The question now is whether *Malloy* requires the overruling of *Cohen* in its entirety. For reasons that follow I think it clear that it does not.

It should first be emphasized that the issue here is plainly not whether lawyers may "enjoy first-class citi-

zenship." Nor is the issue whether lawyers may be deprived of their federal privilege against self-incrimination, whether or not criminal prosecution is undertaken against them. These diversionary questions have of course not been presented or even remotely suggested by this case either here or in the courts of New York. The plurality opinion's vivid rhetoric thus serves only to obscure the issues with which we are actually confronted, and to hinder their serious consideration. The true question here is instead the proper scope and effect of the privilege against self-incrimination under the Fourteenth Amendment in state disciplinary proceedings against attorneys.[1] In particular, we are required to determine whether petitioner's disbarment for his failure to provide information relevant to charges of misconduct in carrying on his law practice impermissibly vitiated the protection afforded by the privilege. This important question warrants more complete and discriminating analysis than that given to it by the plurality opinion.

This Court reiterated only last Term that the constitutional privilege against self-incrimination "has never been given the full scope which the values it helps to protect suggest." *Schmerber* v. *California,* 384 U. S. 757, 762. The Constitution contains no formulae with which we can calculate the areas within this "full scope" to which the privilege should extend, and the Court has therefore been obliged to fashion for itself standards for the application of the privilege. In federal cases stemming from Fifth Amendment claims, the Court has chiefly derived its standards from consideration of two factors: the history and purposes of the privilege, and the character and urgency of the other public interests

---

[1] No claim has been made either here or in the state courts that the underlying facts representing petitioner's alleged conduct were not such as to entitle him to claim the privilege against self-incrimination. We therefore deal with the case on the premise that his claim of privilege was properly asserted.

involved. See, *e. g., Orloff* v. *Willoughby,* 345 U. S. 83; *Davis* v. *United States,* 328 U. S. 582; *Shapiro* v. *United States,* 335 U. S. 1. If, as *Malloy* v. *Hogan, supra,* suggests, the federal standards imposed by the Fifth Amendment are now to be extended to the States through the Fourteenth Amendment, see also *Griffin* v. *California,* 380 U. S. 609, it would follow that these same factors must be no less relevant in cases centering on Fourteenth Amendment claims. In any event, the construction consistently given to the Fourteenth Amendment by this Court would require their consideration. *Bates* v. *City of Little Rock,* 361 U. S. 516. I therefore first turn to these factors to assess the validity under the Fourteenth Amendment of petitioner's .disbarment.

It cannot be claimed that the purposes served by the New York rules at issue here, compendiously aimed at "ambulance chasing" and its attendant evils, are unimportant or unrelated to the protection of legitimate state interests. This' Court has often held that the States have broad authority to devise both requirements for admission and standards of practice for those who wish to enter the professions. *E. g., Hawker* v. *New York,* 170 U. S. 189; *Dent* v. *West Virginia,* 129 U. S. 114; *Barsky* v. *Board of Regents,* 347 U. S. 442. The States may demand any qualifications˙which have "a rational connection with the applicant's fitness or capacity," *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, 239, and may exclude any applicant who fails to satisfy them. In particular, a State may require evidence of good character, and may place the onus of its production upon the applicant. *Konigsberg* v. *State Bar of California,* 366 U. S. 36. Finally, a State may without constitutional objection require in the same fashion continuing evidence of professional and moral fitness as a condition of the retention of the right to practice. *Cohen* v. *Hurley,* 366 U. S. 117. All this is in no way questioned by today's decision.

524

As one prerequisite of continued practice in New York, the Appellate Division, Second Department, of the Supreme Court of New York has determined that attorneys must actively assist the courts and the appropriate professional groups in the prevention and detection of unethical legal activities. The Second Department demands that attorneys maintain various records, file statements of retainer in certain kinds of cases, and upon request provide information, all relevant to the use by the attorneys of contingent fee arrangements in such cases. These rules are intended to protect the public from the abuses revealed by a lengthy series of investigations of malpractices in the geographical area represented by the Second Department. It cannot be said that these conditions are arbitrary or unreasonable, or that they are unrelated to an attorney's continued fitness to practice. English courts since Edward I have endeavored to regulate the qualification and practice of lawyers, always in hope that this might better assure the integrity and evenhandedness of the administration of justice.[2] Very similar efforts have been made in the United States since the 17th century.[3] These efforts have protected the systems of justice in both countries from abuse, and have directly contributed to public confidence in those systems. Such efforts give appropriate recognition to the principle accepted both here and in England that lawyers are officers of the court who perform a fundamental role in the administration of justice.[4] The rules at issue here are in form and spirit a continua-

---

[2] The history of these efforts is outlined in Cohen, A History of the English Bar and *Attornatus* to 1450, 277 *et seq.*, 2 Holdsworth, A History of English Law 317, 504 *et seq.*; 6 *id.*, 431 *et seq.*

[3] These efforts are traced in Warren, History of the American Bar, *passim*.

[4] Evidences of this principle may be found in the opinions of this Court. See, *e. g., Ex parte Bradley,* 7 Wall. 364; *Powell* v. *Alabama,* 287 U. S. 45; *Gideon* v. *Wainwright,* 372 U. S. 335.

tion of these efforts, and accordingly are reasonably calculated to serve the most enduring interests of the citizens of New York.

Without denying the urgency or significance of the public purposes served by these rules, the plurality opinion has seemingly concluded that they may not be enforced because any consequence of a claim of the privilege against self-incrimination which renders that claim "costly" is an "instrument of compulsion" which impermissibly infringes on the protection offered by the privilege. Apart from brief *obiter dicta* in recent opinions of this Court, this broad proposition is entirely without support in the construction hitherto given to the privilege, and is directly inconsistent with a series of cases in which this Court has indicated the principles which are properly applicable here. The Court has not before held that the Federal Government and the States are forbidden to permit any consequences to result from a claim of the privilege; it has instead recognized that such consequences may vary widely in kind and intensity, and that these differences warrant individual examination both of the hazard, if any, offered to the essential purposes of the privilege, and of the public interests protected by the consequence. This process is far better calculated than the broad prohibition embraced by the plurality to serve both the purposes of the privilege and the other important public values which are often at stake in such cases. It would assure the integrity of the privilege, and yet guarantee the most generous opportunities for the pursuit of other public values, by selecting the rule or standard most appropriate for the hazards and characteristics of each consequence.

One such rule has already been plainly approved by this Court. It seems clear to me that this rule is applicable to the situation now before us. The Court has repeatedly recognized that it is permissible to deny a status or authority to a claimant of the privilege against

self-incrimination if his claim has prevented full assess-
ment of his qualifications for the status or authority.
Under this rule, the applicant may not both decline to
disclose information necessary to demonstrate his fitness,
and yet demand that he receive the benefits of the
status. He may not by his interjection of the privilege
either diminish his obligation to establish his qualifica-
tions, or escape the consequences exacted by the State
for a failure to satisfy that obligation.

This rule was established by this Court in *Orloff* v.
*Willoughby,* 345 U. S. 83. The Court there held that a
doctor who refused, under a claim of the privilege against
self-incrimination, to divulge whether he was a Commu-
nist was not entitled by right to receive a commission
as an Army officer, although he had apparently satisfied
every other prerequisite for a commission. The Court
expressly noted that "[n]o one believes he can be pun-
ished" for asserting the privilege, but said that it had
"no hesitation" in holding that the petitioner nonethe-
less could not both rely on the privilege to deny relevant
information to the commissioning authorities and de-
mand that he be appointed to a position of "honor and
trust." 345 U. S., at 91. The Court concluded that "we
cannot doubt that the President of the United States,
before certifying his confidence in an officer and appoint-
ing him to a commissioned rank, has the right to learn
whatever facts the President thinks may affect his
fitness." *Ibid.*

Analogous problems were involved in *Kimm* v. *Rosen-
berg,* 363 U. S. 405, in which the Court held that an alien
whose deportation had been ordered was ineligible for
a discretionary order permitting his voluntary departure.
The alien was held to be ineligible because he had failed
to establish that he was not affiliated with the Com-
munist Party, in that he refused to answer questions
about membership in the Party on grounds that the

answers might incriminate him. The petitioner could not prevent the application of a sanction imposed as a result of his silence by interposing the privilege against self-incrimination as a basis for that silence.

These principles have also been employed by this Court to hold that failure to incriminate one's self can result in denial of the removal of one's case from a state to a federal court, *Maryland* v. *Soper (No. 1)*, 270 U. S. 9, and by the Fourth Circuit to hold that a bankrupt's failure to disclose the disposition of his property, although disclosure might incriminate him, requires the denial of a discharge in bankruptcy. *Kaufman* v. *Hurwitz,* 176 F. 2d 210.

This Court has applied similar principles in a series of cases involving claims under the Fourteenth Amendment. These cases all antedate *Malloy* v. *Hogan,* and thus are presumably now subject to the "federal standards," but until today those standards included the principles of *Orloff* v. *Willoughby,* and *Malloy* v. *Hogan* therefore could not alone require a different result. The fulcrum of these cases has been *Slochower* v. *Board of Education,* 350 U. S. 551. The appellant there was an associate professor at Brooklyn College who invoked the Fifth Amendment privilege before an investigating committee of the United States Senate, and was subsequently discharged from his position at the college by reason of that occurrence. The Court held that his removal was a denial of the due process demanded by the Fourteenth Amendment. Its reasons were apparently two: first, the Board had attached a "sinister meaning," in the form of an imputation of guilt, to Slochower's invocation of the privilege; and second, the Board was not engaged in a bona fide effort to elicit information relevant to assess the "qualifications of its employees." The state authorities "had possessed the pertinent information for 12 years," and in any event the questions put to Slochower

by the committee were "wholly unrelated" to his university functions. 350 U. S., at 558.

The elements of the holding in *Slochower* have subsequently been carefully considered on several occasions by this Court. See, *e. g., Beilan* v. *Board of Education*, 357 U. S. 399; *Lerner* v. *Casey*, 357 U. S. 468; *Nelson* v. *Los Angeles County*, 362 U. S. 1. These cases, when read with *Slochower*, make plain that so long as state authorities do not derive any imputation of guilt from a claim of the privilege, they may in the course of a bona fide assessment of an employee's fitness for public employment require that the employee disclose information reasonably related to his fitness, and may order his discharge if he declines. Identical principles have been applied by this Court to applicants for admission to the bar who have refused to produce information pertinent to their professional and moral qualifications. *Konigsberg* v. *State Bar of California*, 366 U. S. 36; *In re Anastaplo*, 366 U. S. 82. In sum, all these cases adopted principles under the Fourteenth Amendment which are plainly congruent with those applied in *Orloff* v. *Willoughby, supra*, and other federal cases to Fifth Amendment claims.

The petitioner here does not contend, and the plurality opinion does not suggest, that the state courts have derived any inference of guilt from petitioner's claim of the privilege. The state courts have expressly disclaimed all such inferences. 24 App. Div. 2d 653, 654. Nor is it suggested that the proceedings against petitioner were not an effort in good faith to assess his qualifications for continued practice in New York, or that the information sought from petitioner was not reasonably relevant to those qualifications. It would therefore follow that under the construction consistently given by this Court both to the privilege under the Fifth Amendment and to the Due Process Clause of the Fourteenth Amendment, petitioner's disbarment is constitutionally permissible.

The plurality opinion does not pause either to acknowledge the previous handling of these issues or to explain why the privilege must now be supposed to forbid all consequences which may result from privileged silence. This is scarcely surprising, for the plurality opinion would create a novel and entirely unnecessary extension of the privilege which would exceed the needs of the privilege's purpose and seriously inhibit the protection of other public interests. The petitioner was not denied his privilege against self-incrimination, nor was he penalized for its use; he was denied his authority to practice law within the State of New York by reason of his failure to satisfy valid obligations imposed by the State as a condition of that authority. The only hazard in this process to the integrity of the privilege is the possibility that it might induce involuntary disclosures of incriminating materials; the sanction precisely calculated to eliminate that hazard is to exclude the use by prosecuting authorities of such materials and of their fruits. This Court has, upon proof of involuntariness, consistently forbidden their use since *Brown* v. *Mississippi,* 297 U. S. 278, and now, as my Brother WHITE has emphasized, the plurality has intensified this protection still further with the broad prohibitory rule it has announced today in *Garrity* v. *New Jersey, ante,* p. 493. It is true that this Court has on occasion gone a step further, and forbidden the practices likely to produce involuntary disclosures, but those cases are readily distinguishable. They have uniformly involved either situations in which the entire process was thought both to present excessive risks of coercion and to be foreign to our accusatorial system, as in *Miranda* v. *Arizona,* 384 U. S. 436, or situations in which the only possible purpose of the practice was thought to be to penalize the accused for his use of the constitutional privilege, as in *Griffin* v. *California,* 380 U. S. 609. Both situations are plainly remote from that in issue here. None of the reasons thought to require the prohibitions

530

established in those cases have any relevance in the situation now before us; nothing in New York's efforts in good faith to assure the integrity of its judicial system destroys, inhibits, or even minimizes the petitioner's constitutional privilege. There is therefore no need to speculate whether lawyers, or those in any other profession or occupation, have waived in some unspecified fashion a measure of the protection afforded by the constitutional privilege; it suffices that the State is earnestly concerned with an urgent public interest, and that it has selected methods for the pursuit of that interest which do not prevent attainment of the privilege's purposes.

I think it manifest that this Court is required neither by the logic of the privilege against self-incrimination nor by previous authority to invalidate these state rules, and thus to overturn the disbarment of the petitioner. Today's application of the privilege serves only to hamper appropriate protection of other fundamental public values.[5]

In view of these conclusions, I find it unnecessary to reach the alternative basis of the Court of Appeals' decision, the "required records doctrine." See *Shapiro v. United States,* 335 U. S. 1.

I would affirm the judgment of disbarment.

MR. JUSTICE WHITE, dissenting.[*]

In No. 13, *Garrity* v. *New Jersey,* the Court apparently holds that in every imaginable circumstance the threat

---

[5] It should be noted that the principle that a license or status may be denied to one who refuses, under the shelter of the constitutional privilege, to disclose information pertinent to that status or privilege, has been adopted in a variety of situations. by statute. See, *e. g.,* 12 U. S. C. § 481; 47 U. S. C. §§ 308 (b), 312 (a) (4); 5 U. S. C. § 2283.

[*][This opinion applies also to No. 13, *Garrity* v. *New Jersey, ante,* p. 493.]

of discharge issued by one public officer to another will be impermissible compulsion sufficient to render subsequent answers to questions inadmissible in a criminal proceeding. I would agree that in some, if not in most, cases this would be the proper result. But the circumstances of such confrontations are of infinite variety. Rather than the Court's inflexible, *per se* rule, the matter should be decided on the facts of each particular case. In the situation before us now, I agree with my Brother HARLAN that the findings of the two courts below should not be overturned.

However that may be, with *Garrity* on the books, the Court compounds its error in *Spevack* v. *Klein,* No. 62. The petitioner in that case refused to testify and to produce any of his records. He incriminated himself in no way whatsoever. The Court nevertheless holds that he may not be disbarred for his refusal to do so. Such a rule would seem justifiable only on the ground that it is an essential measure to protect against self-incrimination— to prevent what may well be a successful attempt to elicit incriminating admissions. But *Garrity* excludes such statements, and their fruits, from a criminal proceeding and therefore frustrates in advance any effort to compel admissions which could be used to obtain a criminal conviction. I therefore see little legal or practical basis, in terms of the privilege against self-incrimination protected by the Fifth Amendment, for preventing the discharge of a public employee or the disbarment of a lawyer who refuses to talk about the performance of his public duty.†

---

† The opinion of my Brother DOUGLAS professes not to resolve whether policemen may be discharged for refusing to cooperate with an investigation into alleged misconduct. However, the reasoning used to reach his result in the case of lawyers would seemingly apply with equal persuasiveness in the case of public employees.

In *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, the Court held that "a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him." 378 U. S., at 79. To implement this holding the Court further ruled that the Federal Government would be constitutionally prohibited from making any such use of compelled testimony and its fruits. This holding was based on the desirability of accommodating the interests of the State and the Federal Government in investigating and prosecuting crime.

A similar accommodation should be made here, although the multiple interests involved are those of the State alone. The majority does not deny that the State and its citizens have a legitimate interest in ridding themselves of faithless officers. Admittedly, however, in attempting to determine the present qualifications of an employee by consultation with the employee himself, the State may ask for information which, if given, would not only result in a discharge but would be very useful evidence in a criminal proceeding. *Garrity,* in my view, protects against the latter possibility. Consequently, I see no reason for refusing to permit the State to pursue its other valid interest and to discharge an employee who refuses to cooperate in the State's effort to determine his qualifications for continued employment.

In my view, Spevack was properly disbarred. With all due respect, I therefore dissent.