THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* SUSAN JOHNSON, Defendant.

Criminal Court of the City of New York, New York County, February 6, 1967.

*Lauterstein & Lauterstein* (*Henry Lauterstein* of counsel), for Metropolitan Opera Company, *amicus curiæ. Irving Younger* for defendant.

MAURICE WAHL, J. The defendant, Mrs. Susan Johnson, a citizen of the United Kingdom, while in the United States on a temporary visa, is charged with a violation of section 168 of the General Business Law, in that: " on December 8, 1966, at about 6:25 P.M., at 30 E. 18th Street, New York 9, N. Y. in the County of New York, City and State of New York, the

defendant did sell two tickets to the Metropolitan Opera at Lincoln Center Plaza, dated Saturday evening, December 31, 1966 — tickets #T115 and T116. Tickets being priced $20 each. Said defendant asked for and received payment of $80 U. S. currency indicating that the charge was $40 per ticket.''

The essential facts are not in dispute. The defendant purchased two tickets at $20 each in late November for the performance of '' Die Fledermaus '' on December 31, 1966. She testified that she made such purchase with an eye of inviting her estranged husband to escort her to that performance. It was, she said, a step in the hopeful eventuality of a reconciliation. When her husband rebuffed her and she found herself without use for these tickets, she placed an ad in the '' Village Voice '', a local Greenwich Village publication, inviting offers to purchase her tickets. She published no price. The ad read:

'' MET OPERA DEC 31 TWO
ORCHESTRA TIX FLEDERMAUS
What offers? OR 7 – – – – ''

Responsive thereto, a New York City police inspector, accompanied by a policewoman, telephoned and made an appointment to meet defendant. They did so meet at defendant's apartment and freely discussed the prospective sale. They did not disclose that they were police officers. When a price of $40 each was agreed upon and the money passed, only then did the officers disclose their identity and place defendant under arrest and charge her as above stated, to wit: with the resale of tickets of admission.

The defendant enjoys a blameless record; has never before been in any trouble of any kind or nature; is a person of substance and good repute and, as the record indicates, never before had anything to do with the purchase and resale of tickets of admission at the Metropolitan or any other theatre or place of amusement or entertainment. Her naivete and unfamiliarity with the requirements of section 168 of the General Business Law are plainly demonstrated by her advertising these tickets for sale.

The Metropolitan Opera Association appeared at the hearing and aided the prosecution, as *amicus curiæ*. The Corporation Counsel and the attorney for the Metropolitan Opera submitted briefs. In addition to urging a conviction, the Opera Association makes the claim that if a holder of tickets is unable to use them he is obligated to turn them back without refund, and the original purchase price therefor is deemed a contribution or gift to its employees' fund. It is claimed that this is pro-

vided for by the opera rules and regulations. No evidence was adduced that defendant had knowledge of the Association's rules nor that she was even told about them. An enforced contribution to an employees' fund is not in the best interests of the public. The Opera Association has no authority, as far as this court can determine, to impose such a unilateral obligation or penalty upon the bona fide purchaser of its tickets. A contribution should be a matter of voluntary choice.

A sample ticket supplied by the Opera Association provides in very fine print only that it is *voidable,* not void, if transferred without the management's consent; and that a "refund will be made only in the event of change of opera". There is nothing which absolutely prohibits its transfer or *voids* the ticket. It is further noted that the complaint herein does not allege nor charge whether defendant was or was not licensed pursuant to law. It would appear that defendant is rather being charged with "ticket speculating". Even were it so, the facts do not come within the provisions of the statute.

Parenthetically, this isolated transaction upon which this prosecution is founded, if defendant were found guilty, would stigmatize her with a misdemeanor crime and would endanger her present temporary visa and perhaps bar her future return to the United States either as a visitor or as a permanent immigrant.

In approaching the determination to be made herein, the court recognizes that the statute was enacted to remedy certain evils. This legislation, declarative of public policy, is to be given effect and intendment to accomplish the avowed legislative direction. The evils sought to be cured, the damage to be cured, the safeguards to the public, especially in New York City, now known euphemistically as "Fun City", are to be weighed. The whole purpose and thrust of this legislation is to preserve the public welfare, to advance the enlargement of the arts and theatre, so that the many may enjoy those fine facets of life, not merely to save them for the favored few. In advancing this human happiness and dignity the court must also disagree with what is urged by the prosecution as an inflexible rule of law, with a purpose under the facts at bar, that conflicts with the conscience of the court, devoid of both compassion and good sense, and inherent justice.

Article X-B of the General Business Law makes new provisions concerning ticket speculators and unlawful charges (§§ 168-a, 169-k). Section 168 of the General Business Law upon which this instant charge is grounded, is part of article X-B of the General Business Law. A detailed study of this

article, the legislative intent, the intended thrust of the statute, all convince this court, beyond doubt, that it was not the legislative intent to embrace a case such as the one at bar within the ambit of the statute. Section 167 through 169-k, as amended, all show a consistent scheme to regulate and control the business of selling, reselling or otherwise dealing in theatre tickets. This court cannot find any legislative intent to make applicable, albeit it would appear that the singular language of section 168 applies, a misdemeanor to the factual showing here made.

Demonstrably the law was enacted to eliminate speculation and scalping on tickets of admission to places of amusement and has no reference to an isolated transaction by one who, having purchased a ticket of admission, finds herself unable to use the same. The section itself indicates that no person shall engage in the business of reselling tickets of admission without first having procured a license.

In the case of *Matter of Steinbeck* v. *Gerosa* (4 N Y 2d 302, 308), the Court of Appeals defined " business " as : " ' Business ' has been described as a word of ' large * * * import ', a ' very comprehensive term '. It encompasses ' That which occupies the time, attention and labor of men for the purpose of livelihood or profit, but it is not necessary that it should be the sole occupation or employment. It embraces everything about which a person can be employed.' "

The term " business " has been variously defined in a number of decisions to give sense and meaning to the proper construction of the statute then under consideration.

In the case of *People* v. *Gillette* (172 Misc. 847, 849, 850) the court defined " business " as follows:

" The word ' business ' has a broader definition. It is defined by the Standard Dictionary as follows: 1. A pursuit or occupation; trade; profession; calling; also, commercial affairs. 2. A matter or affair. 3. Interest; concern; duty. 4. A commercial enterprise or establishment. 5. A state of being busy.

\* \* \*

" There is a well-known principle of statutory construction which is coeval with municipal law, that purely statutory offenses cannot be established by implication, and that acts otherwise innocent and lawful do not become crimes, unless there is a clear and positive expression of the legislative intent to make them criminal. (*People* v. *Phyfe,* 136 N. Y. 554.) "

This court is inclined to believe that the statute does not apply to an isolated transaction by a person not engaged in the business of reselling tickets. (See *Kauffman & Sons Saddlery Co.*

v. *Miller,* 298 N. Y. 38, 44 [1948]): "Where the language of a statute is susceptible of two constructions, the courts will adopt that which avoids injustice, hardship, constitutional doubts or other objectionable results." (See, also, *Chatlos* v. *McGoldrick,* 302 N. Y. 380, 388 [1951].)

If the Legislature intended that any sale, even though the same was evidently an isolated transaction, would make the individual so involved guilty of a crime, it had no need to refer to the buying and selling of tickets as a business, but could plainly have said that any sale or transfer constituted a violation of the section.

The prosecution quotes an opinion of the Attorney-General in 1929 that R. H. Macy & Co., Inc., was engaged in the resale of theatre tickets without fee, profit or commission and was not required to have a license under article X-B (opinion of the Attorney-General 136, 1929) because it was not making a profit therefrom. This is difficult to comprehend. No department store is engaged in selling tickets at cost price because it seeks to encourage altruism. On the contrary, it expects, not without success, to vend its wares displayed on the counters. Here the question is whether the defendant resold a ticket without a license, and the profit angle is not pertinent. Indeed, the prosecution contends that any sale, even to a relative or friend, of a ticket of admission to a theatre, place of amusement or entertainment, etc., with or without profit, constitutes a violation of the law. This is unacceptable to this court and it is *reductio ad absurdum.*

*People* v. *Villiers* (Docket No. 1917–1965, Pt 6A, New York County) cited by the prosecution, differs on the facts. There defendant was "hawking" in front of Carnegie Hall. While he claimed he was waiting for his mother, sister and her husband to meet him, they allegedly did not show up. Defendant then made no attempt to produce them as witnesses to support his defense. None of the cases cited by the Metropolitan Opera as *amicus curiæ* are in point.

Finally, the record here is devoid of any showing by the prosecution, when the police officers entered defendant's apartment with consent but without disclosure, that they were police officers, that they properly and adequately warned defendant against self incrimination. The recent pronouncements by the Supreme Court, i.e., *Miranda* and other like decisions, have cast considerable doubt upon what would appear to be an entrapment. That disclosure of being police officers, *after the incrimination,* clouds the procedure and evidence. The application of the Fifth Amendment, United States Constitution, only recently

decided by the United States Supreme Court to public employees and licensees (*Garrity* v. *New Jersey,* 385 U. S. 493; *Spevack* v. *Klein,* 385 U. S. 511) would predict the course that, in a case such as the one at bar, failure to warn a projected defendant against self incrimination would void a conviction. If hardened criminals must be protected against themselves and perhaps to the harm of the public, then a fortiori the same rights should be accorded to a defendant as we have here.

No great public injury has been done here; nor has the enlargement of crime been aided. The ticket brokers are still under investigation, the taking of " ice " is still reported to be prevalent and in operation. The majesty and dignity of the law have not been tarnished by this defendant. The legend on the ticket is a unilateral option on the Opera's part; no evidence has been submitted that defendant was made aware of the conditions. Even were she, then it is questionable, since she paid for the tickets whether a forfeiture or *involuntary contribution* to the Opera could be had or exacted. It is written in the New Testament, Matthew, XX, 15, " Is it not lawful for me to do what I will with mine own? "

John Selden (1584–1654) in Table Talk, Equity, wrote: " Equity is a roguish thing. For Law we have a measure, know what to trust to; Equity is according to the conscience of him that is Chancellor, and as that is larger or narrower, so is Equity. 'T is all one as if they should make the standard for the measure we call a " foot " a Chancellor's foot; what an uncertain measure would this be! One Chancellor has a long foot, another a short foot, a third an indifferent foot. 'T is the same thing in the Chancellor's conscience."

So in the court's conscience and interpretation of the legislative intent, no embracement of the facts at bar was intended to impose a crime on this defendant and to hold otherwise would be a sad case of judicial myopia if not obtuseness. The court finds defendant not guilty and she is discharged.