Bergan, J.
Defendant is the Commissioner of Street Sanitation of the City of Buffalo, to which position he was appointed in January, 1966. He was, before that, from April, 1954 to January, 1966, Acting Head Parking Fee Collector and Parking Fee Collector of that city.
The Grand Jury of Erie County in March, 1966 conducted an inquiry into defendant’s conduct of the previously held parking fee collecting offices. He was subpoenaed before the Grand Jury; advised of the nature of the inquiry by the District Attorney; offered a waiver of immunity covering his parking fee offices, and refused to sign it.
This action by the People and the Attorney-General is to forfeit defendant’s present office of Commissioner of Sanitation in pursuance of section 6 of article I of the New York Constitution. That section provides “ any public officer ” who refuses to sign a waiver of immunity against subsequent criminal prosecution when called before a Grand Jury to testify concerning his present office or of “ any public office held by him ” within five years ‘ ‘ shall be removed from ’ ’ his present office or shall forfeit it at the suit of the Attorney-General.
Two constitutional questions arise. One under the New York Constitution, whether the parking fee collecting offices previously held by defendant until January, 1966 fall within the term “ pub *611 lic office ” as it appears in section 6 of article I; the other under the Fifth Amendment of the United States Constitution, whether the compulsion exerted by forfeiture of office is a violation of defendant’s protection against self incrimination (Spevack v. Klein, 385 U. S. 511).
The court at Special Term and the Appellate Division have held the parking fee collecting offices held by defendant are not within the term “ public office ” appearing in section 6 of article I, and hence defendant will not forfeit his present place as Commissioner of Street Sanitation. It was unnecessary, in view of that conclusion, to reach the Federal constitutional question. Accordingly, the suit for forfeiture was dismissed and judgment was entered for defendant.
By reference to some constitutional and statutory usage of the term, it is possible to give narrow meaning to the expression “ public officer ” and thus to say that the provision requiring a . waiver, as used in the Constitution, was intended to apply only to an elected official or to one in high administrative authority.
This literal effect would mean that a tax commissioner, for example, would lose his place if he refused to testify concerning his knowledge of a theft of money in his office; but the cashier under him could both refuse to testify about his knowledge of the theft within the area of his official duty, and also keep his job.
The debates in the Constitutional Convention of 1938 disclose a purpose to impose a highly responsive standard of responsibility on people who choose to work in the public service. It was a responsibility not graded off sharply to differentiate between officers with administrative power and those without it. The essential purpose was to impose a duty to disclose knowledge of crimes in the public service or forfeit the public place.
The rank of office bears no meaningful relationship to the duty to disclose knowledge of wrongdoing in the public service. A court, construing this constitutional device designed to protect the integrity of the public service, ought not to say that if a clerk knows of wrongdoing he can cover it up with impunity; while his superior can, for the same thing, lose his office.
The constitutional policy, stated in its ultimate simplicity, is to require any man holding a place in public service, high or low, to choose between keeping his job and disclosing his knowledge of criminal wrongdoing in that place. The imposed choice seems *612 reasonable and the reason behind it applies equally to officials of high and low degree.
The stress in the debates at the 1938 Convention on the proposal which gave birth to this provision was on elected officers. This was because of then recent experiences in the public service. But it becomes clear in reading the discussion (Record, 1938 Constitutional Convention, e.g., pp. 2570-2590) that the provision was aimed at any public official having knowledge of wrongdoing in his office.
Justice Halpern, who proposed the amendment in its original form using the term “public officers” (Record, p. 2570), explained it as relating to the misconduct of public “ officials ”, which is less technical in its statutory usage and hence a broader expression than “ public officers ” (p. 2571), and Senator Feinberg in debate made a similar reference of equivalency between “ public officer ” and “ public official ” (p. 2577).
Justice Eder equated the kind of official with which the Convention was concerned with ‘ ‘ any office holder in the City of New York ” (p. 2591). This, it is true, was an illustrative reference to a statute authorizing inquiries by a city investigator, but it tends to demonstrate that the rank of official the Convention had in mind was not solely the elected or high ranking functionary.
Justice Martin, whose amendment to limit the operative inquiry to that made by a Grand Jury, although he referred sometimes to ‘ ‘ public officers ’ ’ also, repeatedly used the term ‘ ‘ public official ” (see, e.g., Record, pp. 2592, 2597, 2599).
Mr. Fertig stated that there was ‘ ‘ no justification for any public official’s declining to testify ” concerning his “ official work ” (Record, p. 2594). It becomes clear in reading the discussion that this was the general sense of the Convention and the delegates were not distinguishing between high-ranking administrative public officials and those in lower grades of public service.
The Convention was framing a constitutional provision to require anyone in the public service to testify in a proper inquiry concerning his own area of official responsibility or, on refusal, to risk his official place. A constitutional provision, thus broadly designed, would not be fully operative if it held one man personally highly accountable for his official duties and another man not accountable because he held a different or lower title.
*613 Nor is the use of the term “ public officer ” in the Constitution necessarily identical with its use in the Public Officers Law. That statute, concerned largely with appointments, vacancies, qualifications and powers, has definitions for its own technical purposes as to public officers (see, e.g., § 2). But the constitutional provision uses the term “ public officers ” in quite a different context and in much broader scope than the definitive provisions of the statute.
The relevant text of the constitutional provision, as it was proposed by the 1938 Convention and approved that year, was that the officer refusing to waive immunity or testify under the prescribed conditions “ shall be removed from office ” by the appropriate authority or “ shall forfeit his office ” at the suit of the Attorney-General (Record, p. 3360).
It soon became apparent that this removal or forfeiture was no bar to reappointment to another office. (Cf. People v. Harris, 294 N. Y. 424 [1945].) To foreclose this possibility an amendment was approved in 1949 which, before the words “ shall be removed ’ ’, inserted the clause ‘‘ shall, by virtue of such refusal, be disqualified from holding any other public office or public employment for a period of five years ”.
It is argued that the use of “ any public officer ” in describing who is affected by the failure to waive immunity, and the use in the 1949 amendment of ‘ ‘ any other public office or public employment ” in dealing with the consequences, suggest an intentional purpose by the constitutional draftsmen to distinguish between the initial office held and forfeited and the kinds of offices to which the five-year disability would attach.
From this it is suggested that the language, as amended in 1949, shows an intent to provide that a commissioner thus removed could not be appointed to another commissioner’s job or to a commissioner’s clerk’s job within five years; but a commissioner’s clerk could not be removed and would continue to be eligible for appointment either as a commissioner or a clerk.
This is hard rationalization. No such suggestion appeared in any of the debates or public discussion following Harris and which led to the five-year limit on availability for appointment of a removed official. Indeed, in Harris the Commissioner of Water and Water Supply who refused to waive immunity was appointed to a newly created office of Superintendent of Water *614 Rent Delinquencies (294 N. Y. 426, 428) and one of the critical issues in the case, in construing section 6 of article I, as amended in 1938, was that there was “ no provision that a public officer who refuses to sign a waiver of immunity shall not be eligible to election or appointment to any other office” (Thacher, J., p. 427). Thus, the “ only consequence ” was removal from that office (p. 427). It was this omission only that led to the amendment of 1949 and a wider or different consequence ought not be attributed to it.
The contemporary view of the 1949 amendment is indicated in a memorandum by the Grand Jury Association of New York County to the Legislature in support of the bill providing for the change (N. Y. State Legis. Ann., 1949, p. 46). It noted that the debates of the 1938 Convention showed an intention ‘ ‘ that a public official refusing to testify before a grand jury * * * under waiver of immunity, should be removed from office ” but that People v. Harris “ has disclosed a loophole ” which it was suggested be corrected ‘‘ to prevent avoidance of the clear intent ” of the 1938 amendment.
An additional omission in the original provision was uncovered in 1956 by People v. Doyle (286 App. Div. 276, affd. 1 N Y 2d 732) which held that a refusal to waive immunity or testify concerning a previous office would not result in removal from a different present office.
The Attorney-General’s memorandum to the Legislature on a proposal to change this, resulting in the adoption of a further amendment in 1959, covered also the history of the 1949 amendment (N. Y. State Legis. Ann., 1959, pp. 148-150).
The memorandum noted “ that the expressed views of the Legislature and the People [by the 1938 and 1949 amendments] as to what they demand of public officials by way of frank disclosure of their conduct” was now “ frustrated to a great extent ” by the holding of Doyle that the provision was limited to a present office.
Reasonably construed to give sensible effect to its policy purpose, the present language of the provision ought to embrace the offices of Parking Fee Collector and Acting Parking Fee Collector of the City of Buffalo, whose offices were the subject of investigation by the Erie County Grand Jury.
*615 In January, 1967 the Supreme Court decided both Spevack v. Klein (385 U. S. 511, supra) and Garrity v. New Jersey (385 U. S. 493). In Spevack, a lawyer refused to produce demanded financial records or to testify at a judicial inquiry directed by the Appellate Division into his professional conduct, asserting his Federal constitutional privilege against self incrimination. The decision of this court affirming the consequent order of disbarment (16 N Y 2d 1048) was reversed by the Supreme Court.
But although the constitutional protection was extended to lawyers in respect of their private practice, the court expressly declined to reach the situation of the public official claiming a similar privilege under the Fifth Amendment. There seems some intimation from what the Justices wrote that they would, indeed, in such a situation reach a different result.
In Garrity, decided the same day, it was held that policemen who made confession of a crime when confronted with a choice either of incriminating themselves or losing their jobs were entitled to reversal of conviction because the confessions were not voluntary and in this respect the Fourteenth Amendment protected them.
In the opinion by Mr. Justice Douglas in Spevack, it was noted in discussing the possible Garrity situation (p. 516, n. 3): “ Whether a policeman, who invokes the privilege when his conduct as a police officer is questioned in disciplinary proceedings, may be discharged for refusing to testify is a question we did not reach.”
Moreover, Justice Fortas, who constituted one of the necessary five Justices to reach the Spevack result (there were four voting for the opinion of Justice Douglas), expressly distinguished the situation “ between a lawyer’s right to remain silent and that of a public employee who is asked questions specifically, directly, and narrowly relating to the performance of his official duties ” (p. 519).
A public official has the undoubted right to claim a constitutional privilege against self incrimination; but the State has a concommitant right to discharge him from his job if his refusal to testify relates to his public employment.
There is no such inescapable conflict with the Fifth Amendment as to destroy the salutary mandate which the People of New York have written into their Constitution.
*616 The order should be reversed and the motion of plaintiffs for summary judgment granted, without costs.
Chief Judge Fuld and Judges Burke, Scileppi, Keating, Breitel and Jasen concur.
Order reversed, without costs, and matter remitted to Special Term for further proceedings in accordance with the opinion herein.