Clark E. JOHNSON, Plaintiff-Appellant,

v.

The LEVY ORGANIZATION DEVELOPMENT COMPANY, INC., Defendant-Appellee.

No. 85–1081.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1985.

Decided April 30, 1986.

Marty J. Schwartz, Johnson & Schwartz, Chicago, Ill., for plaintiff-appellant.

Bruce S. Sperling, Mitchell H. Macknin, Sperling, Slater & Spitz, Chicago, Ill., for defendant-appellee.

Before CUDAHY, ESCHBACH, and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

The plaintiff-appellant, Clark Johnson, commenced this action against the defendant-appellee, the Levy Organization, seeking to rescind a condominium Purchase Agreement contending that the Levy Organization failed to substantially perform its contractual obligations. The district court granted Levy's motion for summary judgment and Johnson appeals. We affirm.

I

This diversity action arises from the sale of a condominium unit at the "One Magnificent Mile" condominium project in Chicago, Illinois. Johnson met with Lawrence Levy

and Helen Jaeger, President and Vice President of the Levy Organization, in September of 1980, to discuss the purchase of a condominium unit at this new development. The Levy Organization, the seller and developer of the project, made a property report available to Johnson, in compliance with the Municipal Building Code of Chicago (Municipal Code of Chicago § 100.2–5), that described the proposed condominium project including the unit price, size and other details of the various condominium units offered for sale. The sales price for Johnson's unit number 51C was $590,000. An asterisk located next to this price directed the buyer's attention to a footnote at the bottom of the page that stated "10' ceiling."

On December 11, 1980, Johnson executed a Purchase Agreement with the Levy Organization for the purchase of condominium unit number 51C. The Agreement provided in paragraph 5 that the "Estimated Completion Date" of the unit was August 3, 1983, subject to extension for delays "occasioned by strikes, material shortages, labor shortages, casualties, inclement weather conditions, acts of God and other causes beyond the reasonable control of the seller...." The Purchase Agreement further provided that "[i]n the event that closing does not occur on or before December 31, 1985 (the 'Outside Closing Date')" the purchaser may notify the seller "of its election to terminate" the agreement. The Purchase Agreement also contained a notation stating the "purchaser acknowledges that the Seller delivered ... the property report ("Property Report") required by Chapter 100.2 of the Municipal Code of Chicago prior to the purchaser's execution of the Purchase Agreement." Paragraph 19 of the Purchase Agreement contained an all-inclusive contract clause reciting that:

"19. *Entire Agreement. This Purchase Agreement constitutes the entire agreement between Purchaser and Seller. No representations, warranties,* undertakings, *or promises, whether oral, implied or otherwise, can be made or have been made by either Seller or Purchaser to the other unless expressly stated herein or unless mutually agreed to in writing signed by both parties.* All agreements, representations and warranties made herein shall survive the closing of this transaction. Notwithstanding anything herein to the contrary, in the event that the transaction provided for herein shall not have closed prior to such date as shall seven years from the date of Seller's acceptance hereof, then this Purchase Agreement and all obligations of the parties hereunder shall be automatically terminated without the further act of either party hereto."

Finally, paragraph 23 of the Purchase Agreement stated that "Exhibits A, B, C, D, E and F attached hereto are incorporated herein and made a part hereof [the Purchase Agreement]." Exhibit B was a diagram of Unit 51 that indicated, through the use of dotted lines, that the kitchen, foyer, hallways, and bathrooms had suspended ceilings below ten feet.[1] Exhibit C detailed the special features of the condominium unit, and stated that the "foyers, kitchens, baths, halls, and closets where indicated will have suspended ceilings...." Johnson admitted in his deposition that he should have "asked about" the dotted lines on the floor plan.

The record reveals that Johnson, whom the district court characterized as a highly sophisticated real estate dealer, purchased the condominium unit because he believed it to be a sound investment that would increase in value over time. In the spring of 1982, the Chicago, Illinois condominium real estate market deteriorated, as did Johnson's financial condition. Johnson called Levy in the Spring of 1982 and asked to be relieved of his contractual obligation due to his financial difficulties, but Levy refused to release him from the contract. Thereafter, in August of 1982, Johnson vis-

---

1. Johnson admitted in his deposition that he examined the floor plan displaying the dotted lines covering the kitchen, foyers and hallways, prior to signing the Purchase Agreement.

ited Levy's model kitchen to select colors for the kitchen, in unit 51C, and spoke with Helen Jaeger, the vice president of the Levy Organization, who advised Johnson at that time that the foyer had an eight and one-half foot ceiling. Johnson made no response to this informational statement of Jaeger regarding the eight and one-half foot ceiling height. During this same conversation with Jaeger, Johnson informed her that he was "going to buy the unit anyway" in spite of his financial condition since Levy had refused to release him from the contract. On March 3, 1983, Levy advised Johnson by letter that the unit's "Estimated Completion" date would have to be extended four months, from August 3, 1983 to December 5, 1983, "due to adverse winter weather conditions last year and other causes beyond our control." Johnson responded with a letter from his attorney demanding rescission of the contract for failure to timely complete the condominium unit. This letter failed to mention that the eight and one-half foot ceiling in the foyer did not comply with Johnson's understanding of the contract, in spite of the fact that Johnson had earlier received exhibits B and C of the Purchase Agreement, indicating (through the use of dotted lines) that the kitchen, foyers and hallways would have suspended ceilings, and that Jaeger had informed him of this lower ceiling height one year earlier. After Levy refused to release Johnson from the contract, Johnson filed a complaint in the federal district court alleging breach of contract in that the Levy Organization failed to construct ten foot ceilings throughout the entire condominium unit and failed to timely complete the unit.

On February 23, 1984, Northbrook Bank ("Northbrook") filed a motion seeking to intervene in the action. Johnson had given the Levy Organization a letter of credit issued by Northbrook in the amount of $118,000 in lieu of an earnest money deposit. The Levy Organization presented this letter to Northbrook on February 3, 1984 and demanded payment. In its motion, Northbrook sought to interplead the proceeds represented in the letter of credit as the bank was in a quandary as to whether it should transfer the funds to Levy or hold the funds because of the contractual dispute. Northbrook's motion requested that if the court determined that the Levy Organization was entitled to the funds, then Northbrook also asked permission for leave to intervene in order that it might file a counterclaim against Johnson for payment on the letter of credit. On March 13, 1984, the district court allowed Northbrook to intervene only insofar as to allow it to interplead the funds represented in the letter of credit. The court tentatively refused to grant Northbrook's motion to intervene to file its counterclaim at that time, although the court did state "I would think the counterclaim can come in since you have been intruded in this case because of your relationship with Johnson and the issuance of the letter of credit. So, whatever claims you do have, I think perhaps this is the forum to deal with them...." District Court Hearing March 27, 1984 at page 6. Northbrook's motion to file a counterclaim remained pending since the district court never specifically filed an order in the court docket disallowing its claims.

Johnson and Levy subsequently filed motions for summary judgment. Johnson contended that the price schedule attached to the property report containing the footnote reference to "10' ceiling" was part of the Purchase Agreement; thus, under the Purchase Agreement the Levy Organization was required to construct ten foot ceilings throughout his entire condominium unit. Johnson argued that Levy failed to substantially perform since forty-five percent of the condominium unit (the kitchen, foyer, hallways and bathrooms) did not have ten foot ceilings. Johnson also asserted that a question of fact existed as to the reasonableness of Levy's excuse for the three month delay in the completion of the condominium unit. The Levy Organization filed a motion for summary judgment contending that the property report was not part of the contract and that the all-inclusive Purchase Agreement did not require Levy to build ten foot ceilings

throughout the entire condominium unit. The Levy Organization contended that Johnson received the benefit of his bargain as the major living areas, the bedrooms, living room and dining room had ten foot ceilings. Levy also asserted that the Purchase Agreement provided that the August 3, 1983 completion date was only an estimate, and that the Purchase Agreement clearly recited that rescission on the part of the purchaser was available only if the closing date did not occur on or before December 31, 1985.

The trial court, on November 1, 1984, entered its summary judgment decision in favor of Levy in the court docket. In its decision, the court held that the Purchase Agreement, with the all-inclusive contract clause, was the complete and integrated contract entered into between the Levy Organization and Johnson, and did not require that Levy build ten foot ceilings throughout the entire condominium unit. The court also ruled that the August 3, 1983 completion date was only an estimate and that the contract allowed for rescission by the purchaser only if the closing date did not occur on or before December 31, 1985. On December 7, 1984, Johnson filed a motion with the district court requesting that he be allowed to file a second amended complaint alleging misrepresentation, fraud and violations of the Municipal Code of Chicago. The court denied Johnson's motion to file an amended complaint since summary judgment had previously been entered against him (Johnson) over one month earlier on November 1, 1984. On December 17, 1984, the court denied the remainder of Northbrook's motion requesting an opportunity to intervene to file a counterclaim against Johnson. On January 16, 1985 Johnson filed an appeal with this court.

On appeal Johnson raises the following issues: (1) whether the district court erred in entering summary judgment for Levy finding that the property report, with its reference to ten foot ceilings, was not part of the Purchase Agreement and thus the Purchase Agreement did not require Levy to construct ten foot ceilings throughout the entire condominium unit; (2) whether the Municipal Code of Chicago's prohibition against misrepresentation is a part of the contract; (3) whether a question of fact exists as to the reasonableness of Levy's delay in completing construction of the condominium unit; (4) whether the district court failed to properly exercise its discretion in considering Johnson's request to file an amended complaint after summary judgment had been entered against Johnson. Levy, in addition to disputing Johnson's claims on the merits, contends that this court is without jurisdiction to hear this appeal since Johnson filed this appeal on January 17, 1985, more than 30 days after the entry of summary judgment against Johnson on November 1, 1984, and thus Johnson failed to comply with the 30 day filing requirement of Fed.R.App.P. 4(a)(1).

## II

### Jurisdiction

■ Before we determine the merits of this appeal, we address the jurisdictional question. Levy argues that the district court's final order granting summary judgment in favor of Levy was entered on November 1, 1984, and that Johnson did not file his Notice of Appeal until January 16, 1985; thus, Johnson did not timely file his Notice of Appeal within thirty days of the final order, as required by Federal Rule of Appellate Procedure 4(a)(1).[2] Johnson counters that this is a multiparty action

2. Fed.R.App.P. 4(a)(1) provides:
 "In a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal required by 'Rule 3' shall be filed with the clerk of the district court within thirty days after the date of entry of the judgment order appealed from...."

A timely Notice of Appeal from a judgment or order is necessary for this court have jurisdiction. *Terket v. Lund,* 623 F.2d 29, 32 (7th Cir. 1980); *Brainerd v. Beal,* 498 F.2d 901 (7th Cir.), *cert. denied,* 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 664 (1974), *reh'g denied,* 420 U.S. 913, 95 S.Ct. 836, 42 L.Ed.2d 844 (1975).

and, pursuant to Rule 54(b),[3] the final order disposing of this case before the district court was entered on December 17, 1984, when the district court denied Northbrook's motion to file a counterclaim against Johnson. Thus, Johnson contends that his Notice of Appeal, filed on January 16, 1985, was within the thirty day limit of Fed.R.App.P. 4(a)(1).

In February of 1984, Northbrook filed a motion requesting leave to file a complaint and intervene in this action. The Bank in Count I of its complaint sought leave to intervene in order to interplead the funds held in escrow for the Levy Organization under the Bank's letter of credit issued to Johnson. Counts II and III of the Bank's complaint were counterclaims seeking contractual and declaratory relief against Johnson for payment on the letter of credit if the court determined that the Bank was obligated to pay the Levy Organization. On March 13, 1984, the trial court granted Northbrook's motion to intervene only insofar as interpleading the funds due under the letter of credit, stating "that Northbrook's counterclaim would *perhaps* be allowed because of Northbrook's unavoidable intrusion into the existing dispute between Johnson and the Levy Organization," but at the same time the court reserved final judgment as to whether it would allow the counterclaim to be filed. Memorandum Opinion of District Court, December 17, 1984 (emphasis added). The district court granted Levy's motion for summary judgment on November 1. Thereafter, the court ruled on December 17, 1984, that while it had previously allowed Northbrook to file its interpleader claim, it would not allow Northbrook to file its counterclaim

against Johnson since the counterclaim was based upon a different fact situation than the dispute between Johnson and Levy and the dispute between Johnson and Levy had been resolved at the time the court granted Levy's motion for summary judgment. *Id.*

██ The parties have presented no case to us, nor has our research disclosed any case law addressing the specific question of whether or not this court has appellate jurisdiction in the particular fact situation presented to us where a party is added to a suit through an interpleader action. We are to interpret the Rules of Civil Procedure liberally, *Martinez v. Trainor*, 556 F.2d 818, 821 (7th Cir.1977) (" 'The liberal Rules of Civil Procedure must not be transformed by judicial interpretation into traps for the unwary.' "); *Warshawsky & Co. v. Arcata Nat. Corp.*, 552 F.2d 1257 (7th Cir. 1977) (noting that Rule 13(a), one of the Rules of Civil Procedure, "should be interpreted liberally in order to further the general policies of the federal rules...."); *Parker v. Heresz*, 295 F.2d 731 (7th Cir. 1961) (stating that "liberal interpretation [is] to be given to the Federal Rules of Civil Procedure"), and with this rule of construction in mind, application of the express language of Fed.R.Civ.P. 54(b) supports Johnson's position that this court has jurisdiction to hear this appeal. Applying the language of Rule 54(b) to the facts before us, we are convinced the court's granting Northbrook the opportunity to intervene in this action for the limited purpose of interpleading the funds due under the letter of credit converted this case into a multiparty action. Rule 54(b) states that "[w]hen multiple parties are involved" the court may direct entry of final judgment for purposes

---

3. Fed.R.Civ.P. 54(b) provides:

"(b) JUDGMENT UPON MULTIPLE CLAIMS OR INVOLVING MULTIPLE PARTIES. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, crossclaim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the

entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the claims or the right and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."

of establishing appellate jurisdiction "as to one or more ... of the ... parties only upon an express determination that there is no just reason for delay *and* upon an express direction for the entry of judgment." (Emphasis added). In this case, the court did direct the court clerk to enter final judgment for Levy on November 1, 1984, pursuant to Fed.R.Civ.P. 58; the court, however, did not expressly state on the record "that there is no just reason for the delay." *See Mankeikis v. Jordan*, 678 F.2d 720, 721 (7th Cir.1982); *United States General, Inc. v. City of Joliet*, 598 F.2d 1050, 1051 n.1 (7th Cir.1979). Thus, applying the language of Rule 54(b) literally to facts in this case, we hold that the order did not become an appealable order until the district court entered its judgment order on December 17, 1984 denying Northbrook leave to proceed with the remainder of its complaint.

### The Purchase Agreement

Turning to the merits of this case, Johnson initially argues that the Levy Organization failed to substantially perform on the contract since only fifty-five percent of the ceiling area in the condominium unit were ten feet in height. To support this argument, Johnson points to a footnote on the price schedule attached to the property report, reading "10' ceiling" for the condominium unit. Johnson asserts that Illinois law allows parol evidence to establish which documents are to be considered part of the contract and that pursuant to Illinois law this property report is part of the Purchase Agreement, requiring Levy to construct ten foot ceilings through the entire condominium unit. The district court disagreed and found that the terms of the contract were fully integrated within the all-inclusive Purchase Agreement and thus rejected Johnson's attempt to read and impose additional terms into an unambiguous contract; further, the court found that the property report was merely a disclosure document required to be distributed to all potential purchasers of condominium units offered for sale in the future, pursuant to the Municipal Code of Chicago.

■ Johnson contends that pursuant to Illinois law, since the property report and its reference to ten foot ceilings is part and parcel of the Purchase Agreement, it should not be considered as parol evidence varying the term of the contract. Citing *Pecora v. Szabo*, 94 Ill.App.3d 57, 63, 49 Ill.Dec. 577, 582, 418 N.E.2d 431, 436 (1981), and *H.B.G. Corp. v. Houbolt*, 51 Ill.App.3d 955, 10 Ill.Dec. 44, 367 N.E.2d 432 (1977), Johnson asserts that Illinois allows parol evidence to establish which documents are considered by the parties to be part of a written contract, "where different instruments are executed at the same time, between the same parties for the same purpose and in the course of the same transaction, all of the instruments must be read and construed together." *Sudeikis v. Chicago Transit Authority*, 81 Ill.App.3d 838, 37 Ill.Dec. 21, 24, 401 N.E.2d 1114, 1117 (1980) (signed letter and consent decree); *Pecora*, 49 Ill.Dec. at 562, 418 N.E.2d at 436, (bank note and sales agreement); *H.B.G. Corp.*, 10 Ill.Dec. at 46, 367 N.E.2d at 434 (employment and sales agreement). The cases cited are clearly distinguishable from the facts before this court since the documents in the cases cited by Johnson were executed simultaneously pursuant to the same transaction; thus the courts held that under the circumstances the documents constituted one contract. The property report, unlike those documents referred to in the Illinois cases cited by Johnson, under no circumstances can be considered an executed document affirmatively committing one or the other parties to perform. Rather, as characterized by one Illinois court, the property report is a disclosure document that is required to be distributed to all prospective purchasers, pursuant to the Municipal Code of Chicago, *see Jones v. Eagle*, 99 Ill. App.3d 64, 54 Ill.Dec. 350, 424 N.E.2d 1253 (1981), and in this case the footnote attached to this report merely discloses that the condominium unit would have the unique feature of ten foot ceilings.

■ Further, the general rule in Illinois is that " 'if the contract imports on its

face to be a complete expression of the whole agreement, it is presumed that the parties introduce into it every material item, and parol evidence cannot be admitted to another term to the agreement.'" *Sunstream Jet Exp. v. International Air Service Co.*, 734 F.2d 1258, 1265 (7th Cir. 1984) (quoting *Pecora v. Szabo*, 94 Ill. App.3d 57, 63, 49 Ill.Dec. 577, 581–82, 418 N.E.2d 431, 435–36 (1981)); *see also Storybook Homes, Inc. v. Carlson*, 19 Ill.App.3d 579, 582, 312 N.E.2d 27, 29 (1974); *Ireland v. Esposito*, 93 Ill.App.3d 584, 590, 49 Ill. Dec. 48, 53, 417 N.E.2d 738, 743 (1981). In our case, the Purchase Agreement contains an all-inclusive integration clause. Johnson, however, argues that the property report is expressly incorporated in section 4 of Purchase Agreement where it states "the Purchaser acknowledges that Seller delivered ... the property report ("Property Report") required by Chapter 100.2 of the Municipal Code of Chicago prior to Purchaser's execution of this Purchase Agreement." This is merely a statement reciting that the seller has provided the purchaser with a copy of the report; the statement itself imposes no obligations on either the seller or purchaser, except that the seller is to timely deliver the report to the purchaser. Further, Johnson's attempt to incorporate the property's report reference to ten foot ceilings into the Purchase Agreement must fail since the property report itself in paragraph 100.2–2I specifically states that "[a]ll sales are to be made pursuant to the terms and conditions set forth in the Purchase Agreement" and this Agreement does not recite or set forth that the property report is to be considered as part of the contract. Thus it is clear that the property report is nothing more than an informational disclosure document or prospectus required to be distributed to potential purchasers pursuant to the Municipal Code of Chicago and cannot be considered an element of the contract. We hold the property report not to be a part of the all-inclusive Purchase Agreement.[4]

## Misrepresentation

On December 7, 1984, Johnson attempted to amend his complaint and add a count alleging misrepresentation. As previously noted, the court denied Johnson's motion to amend his complaint to add a separate count alleging misrepresentation since summary judgment had been previously entered against Johnson and thus there was no case or controversy pending before the court. Relying on *Schiro v. W.E. Gould & Co.*, 18 Ill.2d 538, 165 N.E.2d 286 (1960), Johnson next attempts to incorporate the terms of Chapter 100.2–3 of the Municipal Code of Chicago prohibiting intentional misrepresentations on the part of the seller into the contract itself and alleges that the Levy Organization breached the contract when it "misrepresented" to Johnson that ten foot ceilings would be built throughout his entire unit.[5] Chapter 100.2–3 of the Municipal Code of Chicago provides:

"No person shall with the intent that a prospective purchaser rely on such act or omission, advertise, sell or offer for sale any condominium unit by (a) employing any statement or pictorial representation

---

4. The general rule in Illinois is that after the court determines the contract to be ambiguous, it may accept parol evidence to determine the intent of the parties. *See, e.g., Sunstream Jet Exp.*, 734 F.2d at 1267–78; *Ireland*, 93 Ill.App.3d at 590, 49 Ill.Dec. at 53, 417 N.E.2d at 743. Johnson does not argue that the Purchase Agreement is ambiguous; rather his only contention is that the property report is a part of the Purchase Agreement.

Even if we were to assume that the issue of ambiguity was raised, the evidence, as discussed later in this opinion, discloses that the parties' did not intend that ten foot ceilings be constructed throughout the entire condominium unit and in fact discloses that Johnson had full knowledge that the 10 foot ceilings would not be considered a requirement of the contract, as evidenced by his receipt and knowledge of paragraph 23 of the Purchase Agreement that refers to attached exhibits A through F and his discussion with Helen Jaeger who told Johnson that 8½ foot ceilings were being built in the foyer.

5. Normally, the plaintiff would plead misrepresentation as a separate and distinct cause of action in addition to the breach of contract claim.

which is false or (b) omitting any material statement or pictorial representation." In *Schiro*, the Illinois Supreme Court stated that the "law existing at the time and place of the making of the contract is deemed a part of the contract, as though expressly referred to or incorporated in it." *Schiro*, 18 Ill.2d at 544, 165 N.E.2d at 290. The contract at issue in *Schiro* did not provide for any specific building specifications regarding sewage and drainage. The Illinois Supreme Court held that as a matter of law the contract incorporated the Municipal Code building requirements and thus the defendant was obligated to perform in compliance with the city's regulations. *See also Economy Fuse & Mfg. Co. v. Raymond Concrete Pile Co.*, 111 F.2d 875 (1940). Here there is no suggestion that the condominium unit was not built pursuant to the physical requirements listed in the Municipal Code of Chicago. Thus we reject Johnson's attempt to expand the holding of the *Schiro* case and include the provision of the Municipal Building Code prohibiting misrepresentation as a requirement of the contract.[6]

    ■ Further, from our review of the record we are unable to discover any evidence that would support an action for misrepresentation as to the height of the ceilings since the conduct of Johnson during the construction period clearly demonstrates that he (Johnson) had full knowledge of the fact that ten foot ceilings were not being constructed throughout the entire condominium unit. Armed with this knowledge, Johnson failed to take any action to inform Levy that he (Johnson) expected all ceilings in the unit to be constructed ten feet in height. Specifically, paragraph 23 of the Purchase Agreement incorporates exhibits A through F into the Purchase Agreement, and Exhibit C explicitly stated in paragraph 2(A)(2) that the "foyers, kitchens, baths, halls and closets where indicated will have suspended ceilings...." Exhibit B also indicates with dotted lines that dropped ceilings would be constructed in foyers, kitchen, closets and hallways. Certainly dotted lines on the floor plan in Exhibit B and the express language in Exhibit C that the foyers and kitchen would have suspended ceilings would indicate to a person of reasonable intelligence, and in particular to a sophisticated real estate dealer, that the ceilings height in these areas would be less than ten feet. Although the court referred to him as a sophisticated real estate dealer, a characterization Johnson does not dispute, Johnson stated in his deposition that he "never thought about [the suspended ceilings]." Further, in his deposition Johnson admitted that at a meeting held approximately one year before the filing this complaint, Helen Jaeger, Levy's representative, told him that the foyer's ceiling was approximately eight and one-half feet high. (Johnson Dep. at 119–121). During this conversation Johnson expressed no concern to Jaeger that the eight and one-half foot ceiling height referred to was in any way inconsistent with his understanding of the contract. Furthermore, during this conversation, he told Jaeger that he was "going to buy it [the unit] anyway" in light of the fact that the Levy Organization refused to accept his request for a release from the contractual obligations because of his financial problems. It is interesting also that in Johnson's letter to Levy demanding rescission of the contract for untimely delivery of the condominium unit Johnson failed to make any mention of the alleged questionable ceiling heights, although as we previously noted he admitted in his deposition that he had been previously told of the eight and one-half foot dropped foyer ceiling by Helen Jaeger and that he had the Purchase Agreement Exhibits in his possession indicating that the foyer, kitchen and hallways would have suspended ceilings.

    It was only after he commenced this lawsuit, in his third attempt to escape and obtain relief from his contractual obligations because of his financial difficulties,

---

**6.** Further, we note that the Levy Organization complied with the express requirement of the Chicago Municipal Code when it delivered the property report to Johnson.

that he raised the issue of ten foot ceilings. As the district court correctly concluded, after viewing the evidence in the light most favorable to Johnson, "[t]hese facts demonstrate [as a matter of law] that the plaintiff knew that ten foot ceilings would be provided in only the major living areas of unit 51C" and that "[t]he footnotes in the sales price schedule of the Property Agreement were only intended to designate those units with unique features." Thus we affirm the district court's decision in granting summary judgment in Levy's favor as Johnson's conduct and the all-inclusive Purchase Agreement, when viewed in its entirety, disclose that the parties did not intend that Levy construct ten foot ceilings in every room of the condominium unit.

### Delay

Johnson next asserts that a question of fact exists as to whether the Levy Organization's proffered excuse for the delay in the opening of the condominium unit from August 3, 1983 to December 5, 1983 was reasonable. The Purchase Agreement provides that "it is *estimated* that the Purchased Unit will be substantially completed by August 3, 1983 ('Estimated Completion Date'), subject to extensions for delays occasioned by strikes, material shortages, labor shortages, casualties, inclement weather conditions, acts of God and other causes beyond the reasonable control of the seller...." The Purchase Agreement also states that "[i]n the event that closing does not occur on or before December 31, 1985 (the 'Outside Closing Date')," the purchaser may provide the seller with "written notice ... of its election to terminate." In a letter dated March 3, 1983, the Levy Organization informed Johnson that because of "adverse winter weather conditions last year and other causes beyond our control the unit would not be completed until December 5, 1983."

The Purchase Agreement clearly provides that the August 3 target date for completion of the condominium unit was an "Estimated Completion Date" and that the date of completion could be extended "for delays occasioned by strikes, material shortages, labor shortages, casualties, inclement weather conditions ... and other reasons beyond the reasonable control of the seller." Further, the Purchase Agreement specifically stated that if the unit was not completed within the "Outside Closing" date of December 31, 1985, only then could the purchaser give notice of termination of the contract for untimely delivery. As the district court noted, pursuant to Illinois law, "[w]hen a contract addresses the appropriate relief it will control unless it is contrary to public policy. *First Financial Insurance Co. v. Purolator Security, Inc.,* 69 Ill.App.[3d] 413, [26 Ill.Dec. 393, 396], 388 N.E.2d 17, 20 (1979)." The district court observed that the "plaintiff makes no claim that the delay was occasioned by the seller, nor does he claim the relief provided in the contract was contrary to public policy." [7] Levy's reasons for extending the closing date fell squarely within the contractual terms of the Purchase Agreement and the unit was completed prior to the outside closing date set forth in the contract; thus we agree with the district court that no question of fact exists as to whether Levy timely performed.

### The Amended Complaint

Finally, Johnson claims that the court "erred in not exercising its discretion to allow Johnson leave to file a second amended complaint." The court entered judgment in favor of Levy on November 1, 1984; on December 7, 1984, Johnson requested that he be allowed to amend his complaint in order that he might plead violations of the Chicago Municipal Code and

---

**7.** Johnson's claims Levy breached the contract as it did not timely perform. He claims a question of fact exists since Levy "did not offer any evidence that the delays were beyond the reasonable control of the seller." Br. at 21. This contention is without merit since the Levy Organization firmly stated in its letter that the delay was occasioned by bad weather and other

conditions beyond its control. As noted by the district court, Johnson has failed to point to any evidence in the record to rebut this contention. *See American Nurses' Ass'n v. State of Illinois,* 783 F.2d 716, 729–30 (7th Cir.1986) (burden of proof on non-movant to produce evidence rebutting movant's evidence establishing no issue of fact).

misrepresentation on the part of Levy in formation of the contract. The court denied this motion stating that "[t]here isn't anything left to amend. The judgment was entered. You lost. So, if that was incorrect, then you have to change that, but there is nothing pending to amend." District court hearing, Dec. 7, 1984 at 3. We are confident that when the court stated "you lost. So, if that was incorrect, then you have to change that, but there is nothing left to amend" the court was pointing out to Johnson that he would have to file initially a motion pursuant to Fed.R.Civ.P. 60(b), and ask leave of the court to set aside the judgment for good cause. Thus, since summary judgment had previously been entered against Johnson, the court could not consider his amended complaint until this judgment order had been vacated pursuant to Rule 60(b). Johnson, however, never filed a motion pursuant to Rule 60(b) to vacate the judgment. Johnson argues that the district court's decision to grant summary judgment did not become final for purposes of appeal until December 17, 1984, when the district court dismissed the remaining portion of Northbrook's motion to intervene; thus, he contends that the summary judgment decision filed in favor of the Levy Organization was not a final order and he was not required to file a motion pursuant to Rule 60(b) to set aside the judgment. He asserts further that the court should have assessed the merits of

allowing him to file his amended complaint and that in failing to do so the court failed to exercise its discretion.

■ We do not have to reach Johnson's argument that the court failed to exercise its discretion in reviewing his amended complaint since our review of the transcript of the December 7, 1984 hearing reveals that Johnson failed to request that the court set aside the judgment and failed to present any argument to the court that he was not required to initially have the summary judgment set aside before the court could consider his amended complaint. Thus Johnson has waived this argument as it is "axiomatic that arguments not raised below are waived on appeal." *Libertyville Datsun Sales, Inc. v. Nissan Motor Corporation,* 776 F.2d 735, 737 (7th Cir.1985); *see also Erff v. Markhon Indus., Inc.,* 781 F.2d 613, 618 (7th Cir.1986). Had Johnson presented this argument to the court at that time, the court would have had the opportunity to make the necessary findings addressing the merits of its refusal to accept the amended complaint. But because of Johnson's failure to present this argument to the court, the court had no opportunity to address this issue.[8] Further, we are confident that the court would not have allowed the amended complaint to be filed under the facts of this case since the court found that the evidence revealed that the parties did not intend that ten foot ceilings be constructed throughout the entire unit.

**8.** We are in agreement with the trial court that Johnson would have had to file a motion requesting the judgment to be set aside as the court had already entered judgment against Johnson. Having dismissed Johnson's breach of contract action on the merits, there is nothing pending before the court to amend. *See* 6 C. Wright & A. Miller, Federal Practice and Procedure § 1484 (1971); *Freeman v. Continental Gin Co.,* 381 F.2d 459 (5th Cir.1967). The district court could not very well allow Johnson to amend his complaint when there was no case or controversy pending before the court, without Johnson being initially required to file a motion to vacate the summary judgment decision. *See Twohy v. First National Bank of Chicago,* 758 F.2d 1185, 1196 (7th Cir.1985); *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1111 (7th Cir.1984) (plaintiff may amend complaint under Fed.R.Civ.P. 15(a), solely with "leave of court" *after* motion under Fed.R.Civ.P. 59(e) or 60(b)

has been made and the judgment set aside or vacated); *Swam v. United States,* 327 F.2d 431 (7th Cir.1964), *cert. denied,* 379 U.S. 852, 85 S.Ct. 98, 13 L.Ed.2d 55 (1964). Thus we agree with the district court that "there was nothing left to amend," and until Johnson filed a motion to vacate the judgment against him and had that judgment lifted, the court would not have to consider the merits of whether to allow him to amend his complaint.

Further, in order to reverse the district court we would have to hold that the court abused its discretion in refusing to allow Johnson to amend his complaint after judgment had been entered. *United States v. Oremus,* 619 F.2d 683, 692 (7th Cir.1980). Johnson, however, has failed to provide this court with any reason explaining his failure to timely file his amended complaint prior to entry of a summary judgment in this case.

The amended complaint alleged that the Levy Organization misrepresented to Johnson that ten foot ceilings would be built throughout the entire condominium unit. Johnson stated in his motion requesting leave to file this complaint that the "operative facts" under the amended complaint alleging misrepresentation and his original complaint alleging breach of contract "are the same." From the evidence of the exhibits attached to and incorporated in the Purchase Agreement indicating that the unit had suspended ceilings, Johnson's own admission that Jaeger informed him that eight and one-half foot ceilings were being built in the foyer, and his failure to inform Levy that these lower ceiling heights were contrary to his understanding of the contract, the court noted the record clearly revealed that Johnson, who the court characterized as a sophisticated real estate dealer, knew that ten foot ceilings were not contemplated for all ceilings in the condominium unit. The trial court reasoned, and this court agrees, that the "operative facts" demonstrated the parties never intended that there be 10 foot ceilings throughout the entire condominium unit, and thus any cause of action for misrepresentation would be meritless.

We affirm the decision of the district court and award costs to the defendant on appeal.