Don **SERPAS**, Raymond **Johnson** and Carl **Waters**, individually and on behalf of all others similarly situated, Plaintiffs-Appellees,

v.

Charles E. **SCHMIDT**, et al., Defendants-Appellants.

No. 85–2393.

United States Court of Appeals, Seventh Circuit.

Argued April 2, 1986.

Decided July 17, 1987.

Rehearing and Rehearing En Banc Denied July 17, 1987.

Moshe Jacobius, Asst. Atty. Gen., Chicago, Ill., for defendants-appellants.

Thomas B. Quinn, Schiff, Hardin & Waite, Chicago, Ill., for plaintiffs-appellees.

AMENDED OPINION

Before CUDAHY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Plaintiffs brought this suit, individually and on behalf of all exercise persons, grooms and hot walkers (collectively, "backstretchers") at Illinois race tracks, seeking declaratory and injunctive relief from certain investigative practices authorized by the Illinois Racing Board (the "Board") and carried out by the Illinois Department of Law Enforcement ("IDLE") on the ground that these practices violated the Fourth Amendment, as applied to the state of Illinois through the Fourteenth Amendment. The challenged practices included warrantless searches of the backstretchers' on-track dormitory rooms and investigatory stops and searches of the backstretchers' persons within the race track enclosure. Plaintiffs also challenged the Board's policy of granting them occupation licenses only upon their consent to these searches. The defendants argued that the plaintiffs lack a legitimate expectation of privacy owing to pervasive state regulation of the horse-racing industry, to the nature of the premises searched and to the plaintiffs' implied consent to the searches when they accepted their employment. The district court granted the plaintiffs' motion for a preliminary injunction and, later, enjoined the searches permanently on plaintiffs' motion for summary judgment. We affirm.

Backstretchers work at race tracks, feeding, grooming, exercising and generally taking care of the race horses. They are employed by the horses' trainers and licensed by the Board under authority vested in the Board by the Horse Racing Act of 1975 (the "Act"), Ill.Ann.Stat. ch. 8, para. 37 (Smith-Hurd Supp.1987). Many of the backstretchers live in dormitory rooms located in the backstretch, which is the area where the horses are stabled. These rooms are owned by the race track and made available to the trainers and the backstretchers in their employ at no charge. Backstretchers do not have to live at the track, but many do so for reasons of convenience and economy.

Because backstretchers have contact with the race horses immediately before and between races, they are in a position to administer drugs or apply mechanical devices (called "buzzers") to the horses, both of which affect the speed of a horse and hence the outcome of a race. The Act forbids these practices. Ill.Ann.Stat. ch. 8, paras. 37–36, 37–37 (Smith-Hurd Supp. 1987). The Board and IDLE, which the legislature charged with the enforcement of the Act, Ill.Rev.Stat. ch. 8, para. 37–34 (1983), believe that warrantless searches of all backstretch areas, including the dormitories, and of licensees' persons is the only effective way of enforcing the statutory prohibitions against the use of drugs and buzzers. Backstretch areas and licensees are searched when IDLE has received a "tip" or when irregularities are noted in a horse's performance; searches are also performed at random. We have no reason to question the Board's representations about the threat posed by drugs and buzzers and its need to take strong measures against them.

In this respect, the Act vests in the Board broad authority to regulate the horse-racing industry in Illinois. Specifically,

The Board, and any person or persons to whom it delegates this power, is vested with the power to enter the office, horse race track, facilities and other places of business of any organization licensee to determine whether there has been compliance with the provisions of this Act and its rules and regulations.

Ill.Ann.Stat. ch. 8, para. 37–9(c) (Smith-Hurd Supp.1987). Pursuant to its rulemaking powers, the Board has promulgated Thoroughbred Rules 322 and 25.19 (the "Rules"), which employ identical language and read as follows:

(a) The Illinois Racing Board or the state steward investigating for violations of law or the Rules and Regulations of the Board, shall have the power to permit persons authorized by either of them to search the person, or enter and search the stables, rooms, vehicles, or other places within the track enclosure at which a meeting is held, or other tracks or places where horses eligible to race at said race meeting are kept, of all persons licensed by the Board, and of all employees and agents of any race track operator licensed by said Board; and of all vendors who are permitted by said race track operator to sell and distribute their wares and merchandise within the race track enclosure, in order to inspect and examine the personal effects or property on such persons or kept in such stables, rooms, vehicles, or other places as aforesaid. Each of such licensees, in accepting a license, does thereby irrevocably consent to such search as aforesaid and waive and release all claims or possible actions for damages that he may have by virtue of any action taken under this rule. Each employee of a licensed operator, in accepting his employment, and each vendor who is permitted to sell and distribute his merchandise within the race track enclosure, does thereby irrevocably consent to such search as aforesaid and waive and release all claims or possible actions for damages they may have by virtue of any action taken under this rule. Any person who refuses to be searched pursuant to this rule may have his license suspended or revoked.

(b) The Illinois Racing Board delegates the authority to conduct inspections and searches, under this rule, to the Chief Investigator of the Illinois Racing Board and to Special Agents of the Illinois Bureau of Investigation, or other designees of the Department of Law Enforcement assigned, from time to time, to assist the Chief Investigator in his duties.

The challenged searches were undertaken pursuant to this regulation.

The Act also empowers the Board to prescribe application forms and issue licenses to backstretchers. Ill.Ann.Stat. ch. 8, paras. 37–15, 37–20 (Smith-Hurd Supp. 1987). Prior to the entry of the preliminary injunction in this case, the license application form used by the Board quoted the text of the above Rules and conditioned the license's issuance upon consent to the searches authorized by the Rules.

The material facts about the searches of the named plaintiffs are undisputed.[1] Don Serpas, Raymond Johnson and Carl Waters are employed as grooms and live in residential quarters at Arlington Park Racetrack. Their residential quarters have been searched by IDLE agents; they have also been stopped and personally searched by IDLE agents within the race track enclosure. No evidence of crime was found during any of the challenged searches. The plaintiffs acknowledge that when they signed the license application forms, they consented to the searches. They also admit that they consented to each of the searches at the time it occurred. They claim, however, that they would not have consented to these warrantless searches if they had not been required to give consent in order to remain in a job as a backstretcher.

On July 30, 1982, these three plaintiffs filed a complaint in the Northern District of Illinois, naming as defendants present and former members of the Board, the director of IDLE and certain unknown IDLE agents and seeking injunctive and declaratory relief. On September 24, 1982, they filed a motion for a preliminary injunction, which was granted in its entirety on

---

**1.** The affidavits submitted by the parties differed in some of the details of the searches. The district court did not consider any of these disputes material. *See* Memorandum Opinion, *Serpas v. Schmidt,* No. 82–C–4715 (N.D.Ill. June 16, 1983), at 2 n. 2 [Available on WESTLAW, DCT database]. The appellants do not contest before this court the propriety of deciding the question presented to the district court by summary judgment.

June 16, 1983. This order of the district court enjoined the defendants from (1) conducting or authorizing searches of persons and residential quarters without a warrant or probable cause; (2) conducting or authorizing investigatory stops of backstretchers without a reasonable suspicion, based on articulable facts, that the backstretchers stopped were engaged in criminal activity; and (3) conditioning the issuance of occupation licenses to backstretchers upon consent to these searches. Memorandum Opinion and Order, *Serpas v. Schmidt*, No. 82–C–4715 (N.D.Ill. June 16, 1983) [Available on WESTLAW, DCT database].

■ On September 19, 1983, the trial court certified Serpas, Johnson and Waters as named representatives of a class consisting of all grooms, exercise persons and hotwalkers at Illinois racetracks. In August and October 1984, the parties filed cross-motions for summary judgment. The trial court filed a memorandum opinion, granting the plaintiffs' motion and entering a permanent injunction on July 11, 1985.

Memorandum Opinion, *Serpas v. Schmidt*, 621 F.Supp. 734 (N.D.Ill.1985). This appeal followed.[2]

## A. Warrantless Searches of Dormitory Rooms

The Fourth Amendment protects against "unreasonable" searches and seizures. The reasonableness of a search depends upon a person's expectation of privacy in the place to be searched, provided that that expectation is one that society is willing to recognize as "reasonable." *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Appellants contend that the backstretchers' asserted expectation of privacy in their on-track dormitory rooms is not the sort of expectation that society recognizes as reasonable. They rely on historic state regulation of the horse-racing industry, the less than commodious quality of the on-track quarters and the backstretchers' implied consent to the searches.

2. After oral argument we asked the parties to provide us with additional briefing on the question whether we should abstain and permit the Illinois courts to rule on the state law issues in the case, thus arguably mooting the federal constitutional questions. *See Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). This question was first raised at oral argument in the course of questioning by the panel.

After examining the supplemental briefs, we have concluded that abstention is not appropriate in this case. As the dissent correctly points out, this circuit has held that it might be proper in some cases for an appellate court to order abstention even though neither party had raised this issue. *See Waldron v. McAtee,* 723 F.2d 1348, 1351 (7th Cir.1983). However, we do not think that it would be appropriate for us to order abstention *sua sponte* here. In the controversy before us, the federal courts are not "the lone guardian of the state's sovereign place under the Constitution," *infra,* p. 32; the defendants are state officials who raised no objection to having the claims against them litigated in federal court until this court itself raised the abstention issue. *See Houston v. Hill,* — U.S. —, — n. 16, 107 S.Ct. 2502, 2512 n. 16, 96 L.Ed.2d 398 (1987) (failure of defendant city to raise possibility of abstention until after it had lost on the merits before an appellate court undercut the force of the city's argument); *Mazanec v. North Judson-San Pierre School Corp.,* 763 F.2d 845, 848–49 (7th Cir.1985) (State defendants did not request abstention until the

end of trial; this is "an independent argument against abstention." "[I]f the responsible state officials are willing to litigate the case in federal court, that court does not *have* to force it back into state court.") (emphasis in original) (citation omitted).

In addition, there is a presumption in this circuit against abstaining once a case has gone to trial; this presumption holds at least "where neither party requested abstention before trial." *Mazanec,* 763 F.2d at 847. The district court in this case granted the plaintiffs' motion for a preliminary injunction in 1983 and enjoined the searches permanently in 1985 on plaintiffs' motion for summary judgment. The defendants did not raise an abstention issue during any of these proceedings, nor did they raise it before us. The dissent contends that *Mazanec* is not applicable to this case because *Mazanec* states that the presumption against abstaining may be rebutted if the state statute at issue could be interpreted narrowly and thus survive a constitutional challenge. *Infra,* p. 32 n. 3. We believe, however, that the resolution of the constitutional issues in this case might well be necessary even if a state court found that the Act did not authorize the Rules. If the plaintiffs had validly consented to the searches or if they had a reduced expectation of privacy, it certainly could be argued that the defendants would not have needed an independent basis of authority under state law to conduct the searches. Thus, abstention might not produce a state law result which would be dispositive of the claims under the federal Constitution.

■ We have no doubt that horse racing is and ought to be a pervasively regulated industry. But a history of pervasive regulation of an industry is not by itself enough to render the warrant requirement superfluous. As we noted in *Bionic Auto Parts and Sales, Inc. v. Fahner*, 721 F.2d 1072, 1079 (7th Cir.1983),

> the degree and extent of past regulation comprise but a part, albeit a substantial part, of a determination of a "reasonable expectation of privacy" under the Fourth Amendment. Otherwise, no protections at all would be appropriate in closely regulated industries. The Fourth Amendment requires that a determination of the "reasonableness" of the intrusion be made. Even in closely regulated industries, the inspection provisions still must be tailored to the state's proper objectives, and they must minimize the dangers inherent in the unbridled exercise of administrative discretion.

It is certainly true, as appellants point out, that the Supreme Court has sanctioned warrantless searches of commercial premises in certain industries subject to longstanding governmental oversight. *New York v. Burger*, —— U.S. ——, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (junkyards); *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (mining); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (firearms); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (alcoholic beverages). In each of these cases, however, an Act of Congress expressly authorized the terms and conditions of searches on specified premises. The rationale for not requiring a warrant in such a situation is that a statutory inspection program "in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant." *Dewey*, 452 U.S. at 603, 101 S.Ct. at 2540. In that way, there is assurance that the individual's privacy interest and the government's interest in law enforcement are properly balanced. *See Marshall v. Barlow's, Inc.*, 436 U.S. 307, 321, 98 S.Ct. 1816, 1824, 56 L.Ed.2d 305 (1978) ("The reasonableness of a warrantless search ... will depend upon the specific enforcement needs and privacy guarantees of each statute.").

■ The statutory authority claimed by the appellants for the searches challenged here states that the Board and its delegates are "vested with the power to enter the office, horse race track, facilities and other places of business" of any licensee to ensure compliance with the Racing Act. Ill.Ann.Stat. ch. 8, para. 37-9(c) (Smith-Hurd Supp.1987). Far from specifying the "terms and conditions" under which warrantless searches of dormitory rooms can be conducted, this statute does not even appear to authorize searches of these areas. Appellants contend that the dormitory rooms are "facilities" for purposes of the Racing Act. We agree with the district court that this is not a reasonable reading of the statutory language. The provision specifically lists a series of places, ending with the catch-all "other places of business." This concluding phrase effectively defines the earlier listed places as places of business. The statute in no way suggests that a residence may be searched. We agree with the district court that these on-track dormitory rooms must be considered the backstretchers' "homes" for Fourth Amendment purposes. Appellants point out that the rooms are very small and located either adjacent to or above the stables in the backstretch of the track. Further, they are only temporary lodgings and are accessible to track authorities by a master key. Nonetheless, they are exclusively residential, and lodgings as cramped, inhospitable or temporary have been considered residences by the courts. *See Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (hotel rooms); *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (rooming houses); *Smyth v. Lubbers*, 398 F.Supp. 777 (W.D.Mich.1975) (college dormitories). There is no evidence that the backstretchers conduct any of their business in the rooms; thus, cases such as *United States v. Cerri*, 753 F.2d 61 (7th Cir.), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985), where petitioner con-

ducted his gun business out of his home, are distinguishable. Given the legal protection historically afforded the home by the Fourth Amendment, *see, e.g., United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972) ("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"), we will not assume that the Illinois legislature meant to authorize warrantless residential searches unless it clearly stated this intention. Thus, because this statute does not even contemplate searches of residences, the statute does not provide any limitations on the discretion of track officials who wish to conduct searches of dormitory rooms. *Cf. Burger*, —— U.S. ——, 107 S.Ct. 2636 (Warrantless search of automobile junkyard pursuant to statute was upheld; statutory scheme limited time, place and scope of such inspections.).

■ Even without explicit statutory authorization for these searches, the appellants contend that sufficient certainty of application to serve as a substitute for a warrant can be found in the regulatory scheme taken as a whole. We disagree. To satisfy the "certainty and regularity" requirement, an "inspection program must define clearly what is to be searched, who can be searched, and the frequency of such searches." *Bionic Auto Parts*, 721 F.2d at 1078. The rules under which the IDLE agents operated do not impose any meaningful limitations on their discretion. As the district court noted,

> The searches may be focused or random and are not restricted to particular times nor restricted to particular areas or items in those areas which are in plain view.... [T]he agents may search plaintiffs' living quarters and personal effects as extensively as they wish. Plainly, the agents have an unrestricted scope of search; requiring them to hand out receipts or consent forms does not affect or limit the agent's discretion to undertake an exhaustive search of every personal effect in an individual's room.

*Serpas v. Schmidt, supra*, at 11–12. The regulatory scheme here thus falls short of

adequately substituting for a warrant. As the Supreme Court explained in rejecting a warrantless search scheme in *Camara v. Municipal Court*, 387 U.S. 523, 532–33, 87 S.Ct. 1727, 1732–33, 18 L.Ed.2d 930 (1967), "[t]his is precisely the discretion to invade private property which we have consistently circumscribed by a requirement that a disinterested party warrant the need to search."

There is no reason to doubt that drugs and mechanical devices pose major threats to the integrity of the horse racing industry. Nor do we question the reality of the Board's concerns about protecting horse racing without broad powers of surveillance over backstretchers and others. But the Fourth Amendment requires regularity of application and an impartial assessment of reasonableness, and neither the controlling statute nor the regulations in this case impose any restrictions on the conduct of warrantless searches of residences. Hence, we agree with the district court that neither the statute nor the regulatory scheme here is sufficient to except these searches from the general rule that searches conducted without the safeguard of a warrant are unreasonable and violate the Fourth Amendment, *see Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–369, 92 L.Ed. 436 (1948).

■ Finally, the appellants argue that the backstretchers impliedly consented to the searches by accepting occupation licenses conditioned upon compliance with Rules 322 and 25.19. Conditioning the receipt of a benefit, such as employment, on the relinquishment of a right that one would otherwise have is not *per se* unconstitutional. *See, e.g., Snepp v. United States*, 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 765 n. 3, 62 L.Ed.2d 704 (1980); *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973). The race track employees consented to the searches based on a regulatory program that required them to give their consent as a condition of employment. As we have already found, however, the regulations were not authorized by statute and were

unconstitutional because neither the regulations nor the governing statute confined the discretion of the state officials conducting the searches. Thus, the validity of the employees' consent was vitiated by the fact that it was premised on the existence of the otherwise unauthorized and unconstitutional regulations.

### B. Warrantless Searches of the Backstretchers

■ The district court also enjoined the Board and IDLE's practice of conducting warrantless stops and searches of the backstretchers' persons within the race track enclosure. Appellants have not suggested that we should analyze the personal searches any differently from the residential searches, and we, too, think that the same rules apply. Like searches of property, searches of the person are generally impermissible absent a warrant issued upon a determination of probable cause. *New York v. Belton,* 453 U.S. 454, 457, 101 S.Ct. 2860, 2862, 69 L.Ed.2d 768 (1981); *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1268 (7th Cir.1983). The deficiencies we have noted in the statute and regulatory scheme apply equally to these personal searches, and the arguments based upon consent are equally unpersuasive in this context.[3] *Cf. Shoemaker v. Handel,* 795 F.2d 1136, 1143 (3d Cir.1986) (regulatory scheme that subjected jockeys to breathalyzer and urine tests was upheld against a Fourth Amendment challenge, in part, because discretion of officials conducting such searches was appropriately circumscribed by regulation), *cert. denied,* —— U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986).

As we have noted, we are certainly not unsympathetic to the appellants' argument that extraordinary surveillance procedures are necessary to preserve the integrity of horse racing. The simple fact is, however, that the Illinois statute and regulations fall far short of providing an adequate basis for the extraordinary procedures undertaken here.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

ESCHBACH, Senior Circuit Judge, dissenting.

The federal courts should abstain from deciding this case to provide the state courts of Illinois an opportunity to construe the state statute at issue, thus potentially significantly altering or entirely mooting the constitutional inquiry. Thus, while I have no particular objection to the constitutional jurisprudence set forth in the majority opinion, I must dissent.

The challenged searches in the instant case were authorized by the Illinois Racing Board (the "Board") under Thoroughbred Rules 322 and 25.19 (the "Rules"), and were purportedly issued under the authority of the Horse Racing Act of 1975, as amended (the "Act"), Ill.Rev.Stat. ch. 8, § 37-9 (Smith-Hurd Supp.1986). After undergoing searches of their persons and rooms at a racetrack pursuant to these Rules, the plaintiffs filed an action in feder-

---

**3.** Appellants argue that we are bound to reverse the district court on the authority of the Supreme Court's summary affirmance of the unpublished decision of a three-judge panel in *Wilkey v. Illinois Racing Board,* No. 74–C–3524 (N.D.Ill.1975), *aff'd,* 423 U.S. 802, 96 S.Ct. 9, 46 L.Ed.2d 23 (1975). In that case the court upheld a Board rule that authorized a personal search of a licensee veterinarian in the backstretch of the track. Unpublished opinions have no precedential effect in this circuit. *See* Circuit Rule 35. Summary affirmances by the Supreme Court do have some precedential effect, although they affirm the lower court's judgment only and not its rationale. Summary affirmances "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions."

*Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977). *Wilkey* involved a challenge by a Board-licensed veterinarian to Rule 322. He had lost his license after refusing to consent to a personal search. Precedential effect "is to be assessed in light of all of the facts of the case," *id.* at 177, 97 S.Ct. at 2241, and *Wilkey* is distinguishable, notably in that the Board argued that there was probable cause to search Wilkey. Further, we note that the Court affirmed *Wilkey* before its more recent pronouncements on the limits of the administrative search exception, *Marshall v. Barlow's, Inc., supra,* and *Donovan v. Dewey, supra.* In light of these factors, we do not think we are bound by the Supreme Court's summary affirmance in *Wilkey.*

al district court, claiming a violation of 42 U.S.C. § 1983 (1982), and requesting damages as well as declaratory and injunctive relief.[1] The district court denied damages but issued a permanent injunction prohibiting defendants from enforcing the Rules via searches like those challenged. The trial court also declared the Rules invalid under the Fourth Amendment, a determination entirely unnecessary on the record in this case. Only the decisions on injunctive and declaratory relief have been challenged on appeal.

This court has a duty under the narrow strictures of *Pullman* abstention, *Railroad Commission of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), to maintain the comity and federalism fundamental to the Constitution by avoiding unnecessary friction with the state courts. *See, e.g., Harrison v. NAACP*, 360 U.S. 167, 176, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959) (Harlan, J.). We also have a duty to avoid unnecessary constitutional adjudication. *See, e.g., Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 345–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

The "paradigm of the 'special circumstances'" that must exist before invoking *Pullman's* narrow exception to the exercise of federal jurisdiction is "a case where the challenged statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a constitutional question." *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 306, 99 S.Ct. 2301, 2313, 60 L.Ed.2d 895 (1979) (quoting with approval *Kusper v. Pontikes*, 414 U.S. 51, 54, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973)); *see also Waldron v. McAtee*, 723 F.2d 1348, 1352 (7th Cir.1983); *City Investing Co. v. Simcox*, 633 F.2d 56, 60 (7th Cir.1980).

This is such a case. No Illinois court has yet addressed the question of whether the challenged searches and Rules under which they were made were beyond the authority of the Act. The majority here and the district court below both appear to believe the Rules invalid for precisely that reason. If the Rules are invalid, the challenged searches, *which exclusively relied upon the Rules*, are all also invalid, and the case is concluded without constitutional adjudication. Every personal and residential search in this action was performed by agents of the Illinois Department of Law Enforcement ("IDLE"), to whom the Board had delegated the authority to enforce the Rules. On the record in this case, the agents of IDLE claimed only the authority of the Rules for every search challenged. No other authority is claimed in the record to justify these searches. Even the occupational licenses required of each worker to gain employment were conditioned upon signing a consent to searches under the authority of the Rules. While the attorneys argued other authority to this court in their briefs, those arguments are merely legal arguments constructed after the institution of litigation. The crux of the matter is that the facts established by the record do not support a plea to any authority except the Rules to justify these searches, and the litigants cannot inject extraneous issues into the case via the briefs. Given the exclusive reliance by the IDLE agents on the Rules, the validity of the Rules is the only issue properly before this court, and it may well be decided by state law.

Thus this case calls for abstention because the statute leaves "reasonable room for a construction by the [state] courts which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially alter the problem." *Harrison*, 360 U.S. at 176, 79 S.Ct. at 1030; *see also Boehning v. Indiana State Employees Association*, 423 U.S. 6,

---

1. Some justices have on occasion taken the position that *Pullman* abstention ought not to apply to cases brought under the Civil Rights Act, *see, e.g., Harrison v. NAACP*, 360 U.S. 167, 180–81, 79 S.Ct. 1025, 1032, 3 L.Ed.2d 1152 (1959) (Douglas, J., dissenting, joined by Warren, C.J., and Brennan, J.); *Boehning v. Indiana State Employ-*

ees Ass'n, 423 U.S. 6, 8, 96 S.Ct. 168, 170, 46 L.Ed.2d 148 (1975) (Douglas, J., dissenting), but that position has never commanded a majority of the Court, and *Pullman* abstention remains applicable, *see, e.g. Boehning*, 423 U.S. at 6–8, 96 S.Ct. at 168–70 (per curiam).

6–8, 96 S.Ct. 168, 168–70, 46 L.Ed.2d 148 (1975) (per curiam); *Lynk v. LaPorte Superior Court No. 2*, 789 F.2d 554, 568 (7th Cir.1986).

In this case, the Illinois courts obviously might provide a limiting construction that would place the challenged searches beyond the Act, *see Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984) (significant possibility of a limiting construction justifies abstention); *Harrison*, 360 U.S. at 176, 79 S.Ct. at 1030 (abstaining because of significant possibility of limiting construction); *see also Lynk*, 789 F.2d at 568, for the Act does not specifically or explicitly authorize either personal or residential searches. Such an interpretation of the Act would significantly alter, if not entirely moot, the constitutional question. The strong possibility of such a limiting construction should deter us from declaring the issue so clear that we will not first defer to a state court's interpretation of its own law. *Cf. Kusper v. Pontikes*, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973) (abstention improper because state law not susceptible of an interpretation that might avoid constitutional adjudication); *Harman v. Forssenius*, 380 U.S. 528, 534–35, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965) (same); *Board of Education v. Bosworth*, 713 F.2d 1316, 1321 (7th Cir.1983) (same).

It might be argued that it is inappropriate to order abstention at the appellate level when the issue was not raised below or suggested by the parties on appeal.[2] But we have recently held otherwise. In *Waldron v. McAtee*, 723 F.2d 1348 (7th Cir.1983), we held that "the court has the power and in an appropriate case the duty to order abstention, if necessary for the first time at the appellate level, even

though no party is asking for it." *Id.* at 1351. Our duty is to the federalism inherent in the Constitution, and we are thereby bound to respect the sovereignty of the states and to avoid unnecessary constitutional adjudication.[3]

Procedural concerns bolster the argument for abstention in this case. The purpose of legal procedure is to expedite the full and frank consideration of substantive legal disputes. If the appellate courts do not order abstention where it is appropriate simply because it was not raised below, litigants will be encouraged to avoid abstention by excluding crucial state issues from their pleadings. Such a practice would place abstention largely in the hands of the litigants, and in many cases the individual goals of each litigant may counsel avoidance of abstention, thus obscuring and perhaps emasculating the interests of the sovereign states in the regulation of their own affairs. When a case presents issues meeting the threshold requirements necessary to invoke the narrow doctrine of *Pullman* abstention, the court may be the lone guardian of the state's sovereign place under the Constitution. We should not shirk that duty.

The majority suggests in a footnote that even if the Act does not authorize the challenged searches, we would still be required to reach the defendants' constitutional arguments based on the plaintiffs' consents to the searches. I do not agree. The Board conditioned the granting of employment licenses upon consent to the Rules, and the district court found that the employees' individual consents at the time of each search were given under the threat of dismissal based upon the authority of the Rules. The invalidation of the Rules

**2.** We raised the potential applicability of abstention at the oral argument on appeal, and the parties then filed briefs on the issue at our request.

**3.** We recently held in *Mazanec v. North Judson-San Pierre School Corp.*, 763 F.2d 845, 848 (7th Cir.1985), that a trial court had abused its discretion by ordering abstention subsequent to the date trial was concluded, and three years after litigation was commenced. *Mazanec* itself distinguished *Waldron* by noting that in *Waldron*

there was a significant possibility that the statute would be held unconstitutional as it stood, but that the state might "save" it by limiting it to pass constitutional muster. *Id.* at 848. The facts at bar are similar to *Waldron;* a state court's interpretation of the Rules and the Act might avoid the necessity of striking down a state law or regulation on constitutional grounds. Thus *Waldron* is the appropriate precedent to apply to the case at bar.

would preclude any future search based upon consent to the Rules, and would prevent the use of consent forms requiring consent to such searches under the authority of the Rules. If the Rules no longer exist, searches may not be based on their authority.

It should also be noted that even with the Rules and consents invalidated, the plaintiffs would still have to show the trial court that they continued to meet the threshold requirements necessary to support an injunction. While the district court found that "in the absence of permanent injunction, they [the plaintiffs] will continue to have their houses and persons searched without a warrant," it apparently did not consider the effect invalidating the Rules would have on police behavior. It is pure speculation to posit that the agents of IDLE would continue these searches subsequent to the invalidation of the Rules; indeed, the agents conducted the personal and residential searches in the backstretch area only in reliance upon the validity of the Rules, as the record shows. There are no findings regarding this crucial point in the district court's opinion, and this silence highlights the fundamental weakness in the majority's opinion: the validity of the searches absent the Rules was not presented to the district court under the record in this case, and should not be at issue before this court.

---

**4.** In their answer the defendants pleaded that sections 37–2 and 37–15 of the Act both independently authorized the Rules, even if section 37–9 did not. Defendants never again explicitly cited, argued, or relied upon the putative authority provided by these sections, and plaintiffs only cursorily argued their insufficiency in authorizing the Rules. More importantly, the district court appears to have decided that the two sections were not at issue, or that the arguments based upon them were so frivolous as to not even require comment, for the court made no mention of them in its opinion. Whatever the statutory or constitutional merits of arguments based upon these sections, they are still framed to authorize the Rules, not to directly authorize searches in the absence of the Rules. Thus their invocation does not affect the focus of this dissent, which is that the validity of the Rules under state law is a crucial question whose resolution will significantly alter or entirely moot the constitutional issues in this case.

The majority also contends that the invalidity of the Rules would not dispose of the defendants' constitutional argument based upon a reduced expectation of privacy due to pervasive government regulation of the horse racing industry. I disagree. The pleadings do not place this defense in issue except in reference to the validity of the Rules. Throughout this action, neither party has raised the argument that the searches were authorized in the absence of the Rules.[4] While the parties may have intended or hoped to put such a theory into this case by their briefs to this court, the record here does not do so, and this court is not at liberty to resolve issues not presented by the record on appeal. *In re Peter Bear,* 789 F.2d 577, 579 (7th Cir.1986); *Johnson v. Levy Organization Development Co.,* 789 F.2d 601, 611 (7th Cir.1986).

Nevertheless, the majority today has gone beyond state law unnecessarily and has decided a constitutional issue not presented to the court. With all due respect, such a decision is ill-advised. My concern is not merely technical; while the parties have addressed themselves to the constitutional requirements necessary to authorize a search under a particular legislative scheme detailing requirements for such searches, the parties have not directly confronted the constitutionality of such searches made without explicit statutory guidelines, probable cause, or reasonable suspicion in a pervasively regulated indus-

---

The defendants did raise an affirmative defense that "warrantless searches and seizures and investigatory stops of occupational licensees within the race track enclosure do not violate the Fourth Amendment to the United States Constitution since horse racing licensees have notice of the likelihood of warrantless searches by the pervasiveness of regulation and by the long history of governmental regulation of this business." (Citations omitted.) However, defendants did not explicitly make clear whether "pervasiveness of regulation" in this defense included the challenged Rules, and the ubiquitous reliance upon the Rules throughout the rest of the defendants' pleadings and briefs strongly suggest that this defense also relied upon the validity of the Rules. Surely defendants would have explicitly announced any claims they believed authorized the searches in the absence of the Rules.

try. This court should not rule upon the issue until a case presents it and does so without also presenting a potentially dispositive and uncertain issue of state law. Otherwise, the court suffers the absence of the sharp definition of issues and exhaustive consideration of legal argument such a case would provide. The case presented to us turns on an unclear issue of state law whose resolution may obviate and would almost certainly significantly alter the need for constitutional adjudication. I would abstain.

## ON PETITION FOR REHEARING

Before BAUER, Chief Judge, CUMMINGS, CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

On January 30, 1987, the defendants-appellants filed a petition for rehearing with suggestion of rehearing en banc. A majority of the panel voted to deny the petition for rehearing. Judge ESCHBACH voted to grant the petition. The petition is accordingly denied. A judge in regular active service requested a vote on the suggestion of rehearing en banc. In light of the amended opinion of the panel filed today, the suggestion of rehearing en banc did not secure a majority.

POSNER, COFFEY, EASTERBROOK, and MANION, Circuit Judges, voted to grant rehearing en banc.

WOOD, Circuit Judge, did not participate in the consideration or decision of this case.

EASTERBROOK, Circuit Judge, with whom POSNER, COFFEY, and MANION, Circuit Judges, join, dissenting from the denial of rehearing en banc.*

The panel's opinion, as amended, holds that Ill.Rev.Stat. ch. 8 § 37–9(c) does not authorize the Illinois Racing Board to conduct administrative searches of living cubicles at race tracks. Then it declares Thoroughbred Rule 322 and Harness Racing Rule 25.19 unconstitutional on two grounds: warrantless searches unauthorized by statute bear a special burden of justification, and the regulations do not contain standards to guide the discretion of the administrative officials. All of the track's backstretchers consented to the searches, but the court says that the consents are invalid because the state did not have the authority to search over objection. Finally, the court deals with searches of the backstretchers' persons at the track. Having made so much of its conclusion that § 37–9(c) authorizes the search of business premises but not living cubicles, the panel nonetheless holds that "the same rules apply" to searches conducted on the business premises.

If the panel had said: "Searches of living quarters and persons require either a warrant or some criteria limiting the discretion of the officers, criteria Illinois does not supply", this would be a plausible though problematic disposition. *New York v. Burger*, —— U.S. ——, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), holds that police may search regulated businesses (in *Burger* auto junkyards) without a warrant, a regular pattern, or any announced criteria. The Court rejected a claim that the searches must be predictable, pointing out that to the extent people can tell when the police will arrive, they can use that knowledge to hide evidence of wrongdoing. —— U.S. at —— n. 2, —————— & nn. 21, 22, 107 S.Ct. at 2639 n. 2, 2648 & nn. 21–22. *Burger* does not use the approach of *Bionic Auto Parts & Sales, Inc. v. Fahner*, 721 F.2d 1072 (7th Cir.1983), another junkyard case on which the panel heavily relied. See 808 F.2d 601, 604–06. *Bionic* said that each inspection must be justified and conducted to "minimize the dangers" of random searches (721 F.2d at 1079); *Burger* held that only the program of searches requires justification, and that particular searches do not need additional support. But *Burger* does not deal with searches of persons and living quarters located on business

---

* Senior Circuit Judge ESCHBACH, although ineligible to vote on the suggestion of rehearing en banc, joins this opinion as an explanation of his vote in favor of rehearing by the panel.

premises, and sooner or later the Court will have to do so. The Board can amend its rules and avoid the difficulty, or press on to the only Court that can resolve the issue. We could add little by trying to apply *Burger* and similar cases to the searches of living quarters and backstretchers.

But the panel did not stop with the observation that searches of persons and their living quarters are different from searches of the rest of the business premises; it did not even start there. It started by making an independent decision on a question of state law, as if the state were just another litigant. It used the conclusion about state law as a basis of its constitutional decision. This approach is highly questionable. So is the panel's treatment of consent. The panel's approach to the interpretation of state laws could govern many cases, as would its handling of consent. Long after Ill.Rev. Stat. ch. 8 § 37–9(c), Thoroughbred Rule 322, and Harness Racing Rule 25.19 have been amended or forgotten, we will have to live with the principles the majority used. These principles deserve more attention than they have received.

1. If the backstretchers had filed a suit under the diversity jurisdiction seeking judicial review of the rules on the ground that they are unauthorized by statute, the suit would have been dismissed because the eleventh amendment deprives the district court of authority to adjudicate such suits. If the backstretchers had filed a suit under 42 U.S.C. § 1983 and added a pendent claim under state law, they still would have lost. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*Pennhurst II*), holds that a federal court may not award relief against a state on the basis of state law. As the Court said, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." 465 U.S. at 106, 104 S.Ct. at 911. Yet that is exactly what the panel has done. It has concluded that the Board does not understand state law and used that as the springboard of its constitutional holding.

The panel's award of relief was not based directly on state law. So the panel may take comfort from *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). But *Pennhurst II* depends not on the eleventh amendment but on principles of immunity that have developed in the shadow of that amendment. It establishes the proper role of federal courts in telling state governments the meaning of state law. That a federal court possesses constitutional power to revise a state's view of the state's law does not imply that the court should do so. Four justices, dissenting in *Pennhurst II*, argued that a state, with its choice of poison, would prefer to lose on state rather than constitutional grounds, and that a federal court does well to avoid the constitutional issue. 465 U.S. at 159–63, 104 S.Ct. at 939–41 (Stevens, J., dissenting). The Court nonetheless rejected this position. No justice in *Pennhurst II* suggested that a court should use state statutory grounds to create a constitutional problem on which the state then would lose. In *Pennhurst II* resort to state grounds would have obviated a federal issue; in this case, the panel's holding on state law set the state up for a fall on a federal issue.

There are at least five ways to find out what state law means in a case like ours. One is to accept the view of the executive branch of the state. A second is to certify the question to the supreme court of the state. A third is to abstain, as Judge Eschbach urged in dissent from the panel's opinion. A fourth is to review the issue of state law with at least the deference given the statutory interpretations of federal agencies. A fifth is to decide the meaning of the law de novo, as if this were a dispute between private parties. The panel ignored three of these methods and brushed aside abstention, proceeding to give its views on the meaning of state law unencumbered by deference to the state's interpretation. This is no way to treat state governments.

I suggested in *Huggins v. Isenbarger*, 798 F.2d 203, 207–09 (7th Cir.1986) (concurring opinion), that the best approach is the first: to accept the position of the State of

Illinois on the meaning of the state's law. The Illinois Racing Board interpreted Ill. Rev.Stat. ch. 8 § 37–9(c) when it issued its rules. The Attorney General of Illinois filed a brief in this court representing that the Board's construction of state law is correct. No state court has questioned this. The State of Illinois thus has presented us with an authoritative construction of its law. If the state had spoken through the Supreme Court of Illinois, we would treat the court's interpretation as beyond our ken; we would accept it merely because the court had said it. Why should we listen *only* to state courts and ignore the views of other officials of the state? Many constructions of law come from courts, but courts pronounce only when necessary to decide cases; executive officials construe laws for other purposes, cf. *Carson v. Block,* 790 F.2d 562, 565 (7th Cir.1986); *Mother Goose Nursery Schools, Inc. v. Sendak,* 770 F.2d 668 (7th Cir.1985). When executive officials are authorized to construe the law, they speak for the state as authoritatively as courts do. Unless a federal court may choose who speaks for the state, the court ought to respect the views of whoever *has* spoken for the state. Cf. *Hilton v. Braunskill,* — U.S. —, 107 S.Ct. 2113, 2120, 95 L.Ed.2d 724 (1987); *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 477–80, 97 S.Ct. 1898, 1902–04, 52 L.Ed.2d 513 (1977); *Barrera v. Young,* 794 F.2d 1264, 1269 (7th Cir.1986). How Illinois apportions governmental powers, including the power to construe statutes, is none of our concern. *Whalen v. United States,* 445 U.S. 684, 689 n. 4, 100 S.Ct. 1432, 1436 n. 4, 63 L.Ed.2d 715 (1980); *Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 615 n. 13, 94 S.Ct. 1323, 1330 n. 13, 39 L.Ed.2d 630 (1974); *Highland Farms Dairy, Inc. v. Agnew,* 300 U.S. 608, 612, 57 S.Ct. 549, 551, 81 L.Ed. 835 (1937); *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 225, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908); *Dreyer v. Illinois,* 187 U.S. 71, 84, 23 S.Ct. 28, 32, 47 L.Ed. 79 (1902); *United Beverage Co. v. Indiana Alcoholic Beverage Commission,* 760 F.2d 155 (7th Cir.1985). Cf. *City of Newport v. Iacobucci,* — U.S.

——, 107 S.Ct. 383, 385–86, 93 L.Ed.2d 334 (1986). Illinois has supplied us with an interpretation of its statute, which we should accept unless set aside by processes sufficient under the law of Illinois.

Perhaps the Attorney General is not authorized by state law to speak for Illinois. We should give the views of the executive branch the sort of respect provided by state law. *National Surety Corp. v. Midland Bank,* 551 F.2d 21, 26 (3d Cir.1977). Thus if the Attorney General's status as an advocate diminishes the force of his views, or if the Attorney General's view is trumped by that of a court, we should respect that allocation of governmental powers. *Huggins,* 798 F.2d at 208–09. But it is commonplace for courts to defer to the views of federal agencies and of the Solicitor General of the United States— even when those views are advanced during litigation. E.g., *Japan Whaling Ass'n v. American Cetacean Society,* — U.S. ——, 106 S.Ct. 2860, 2867–68, 92 L.Ed.2d 166 (1986); *Haig v. Agee,* 453 U.S. 280, 291, 101 S.Ct. 2766, 2773, 69 L.Ed.2d 640 (1981). States, which need not adopt the same separation of powers found within the federal government, may give greater force to statutory interpretations of executive officials. The parties have not addressed the extent to which the Board's, and the Attorney General's, construction of § 37–9(c) is authoritative under state law. We certainly ought not assume, as the panel does, that it is worthless. In *Pennhurst II* the plaintiffs relied on an opinion of the Supreme Court of Pennsylvania, which the court of appeals held showed that the legal position of the executive branch of Pennsylvania was untenable. The Supreme Court held that even the views of the highest court of Pennsylvania did not allow a federal court to override the executive branch's construction of Pennsylvania law. Why may we disagree with the executive branch of Illinois when no state court has spoken?

Certification of the state law question would be one way to avoid this difficulty— at least when the eleventh amendment is not in play, see *Citizens for John W.*

*Moore Party v. Board of Election Commissioners,* 781 F.2d 581, 584–86 (7th Cir. 1986) (dissenting opinion)—but the panel did not certify the question. Abstention is another way to obtain the views of the state courts. The panel in our case declined to abstain, pointing out that abstention disrupts the progress of the case and is not a sound way to proceed when raised belatedly. Yet the high costs of abstention do not explain why the panel did not certify the question. Certification entails neither the costs nor the delay associated with abstention and is appropriate when the statute is susceptible of multiple interpretations. *Houston v. Hill,* —— U.S. ——, —— ——, 107 S.Ct. 2502, 2512–15, 96 L.Ed.2d 398 (1987). Surely either is preferable to holding an entire administrative scheme unconstitutional because unsupported by state law. Even belated abstention is attractive if the alternative is the federal court's substitution of its judgment for the state officials'.

There is one more option: deference to the state agency's construction of state law, as we would defer to a federal agency's construction of federal law. If the Board's rules had been issued by a federal agency, we would have asked not whether the construction is right but whether it is reasonable. See *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 862–66, 104 S.Ct. 2778, 2781–83, 2791–93, 81 L.Ed.2d 694 (1984); *Watkins v. Blinzinger,* 789 F.2d 474, 478 (7th Cir.1986). The regulations were promulgated under a law giving the Board authority to inspect the "race track, facilities and other places of business" of the licensees. The panel says that the Board may not inspect the living cubicles at the track because "other places of business" "effectively defines the earlier listed places as places of business." This is the *eiusdem generis* approach. A reasonable person might deny the applicability or force of this saw, see *Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 587–89, 100 S.Ct. 1889, 1895–96, 64 L.Ed.2d 525 (1980); *United States v. Turkette,* 452 U.S. 576, 581–82, 101 S.Ct. 2524, 2527–28, 69 L.Ed.2d 246 (1981), but even if applicable this canon

does not answer all questions. The cubicles are *part of* the "race track [and] facilities" of the racing licensee, and they promote the operation of the racing business. Licensees make quarters available at the track for their convenience, not because they want to operate apartment houses. The backstretchers may regard the cubicles as residences, but the licensees regard them as part of the track complex. The statute authorizes the Board to inspect the facilities, track, and business *of the licensees;* that the licensee's place of business is someone else's hotel room does not necessarily confine the Board's statutory power. Cf. *United States v. Cerri,* 753 F.2d 61 (7th Cir.1985) (agents may search a gun dealer's home without a warrant, if he chooses to do business at home). As in *Chevron,* the legislature does not appear to have considered, and therefore it has not settled, the problem at hand.

There is, moreover, a different way to read the statute: it authorizes inspection of the track proper, and of "other places of business" away from the track. Racing licensees do not use the tracks year 'round; sometimes more than one licensee uses a track; every licensee has some place of business away from the track. The function of the "other places of business" language then is not to close some portions of race tracks to the Board but to ensure that the Board can follow the business wherever the licensee goes. This reading is consistent with the reasons the Board is authorized to inspect. Papers suggesting improprieties may be hidden anywhere the licensee may be found; drugs given to horses may be hidden at the track and elsewhere. It would be most surprising if the Board may not inspect at least every corner of the race track proper for drugs, forbidden implements, and suspicious papers. Yet under the panel's decision, the licensee can put part of the track off limits by the expedient of inviting an employee to sleep there. That is not an inevitable reading of the statute, one so compelling that we would say that a federal agency exceeded its power in reading the statute to embrace the whole track. The panel treated the

meaning of "race track [and] facilities" as a pure question of law on which it could take a clear shot. It is not appropriate for a federal court to give less deference to a state agency's interpretation of a state statute than to a federal agency's interpretation of a federal statute; the distinction cuts the other way.

2. The panel scrutinized the statutory authority for the Board's rules because it believed that searches are more readily sustained if conducted on statutory authority. Maybe so for searches by federal officials, because a federal court should respect Congress' decision that a category of searches is "reasonable". *United States v. Watson*, 423 U.S. 411, 416, 96 S.Ct. 820, 824, 46 L.Ed.2d 598 (1976). But because states need not observe the separation of functions that prevails within the federal government, they may entrust to executive officials the task of deciding for the political branches what is reasonable. No case I have found even hints that a search by a state official, under color of state regulations, is any different for constitutional purposes from a search under color of a state statute; indeed the distinction between "statute" and "regulation" presupposes a separation of functions that states are free to modify. Many cases sustain state searches, conducted on administrative, regulatory, or no authorization, without suggesting that a statute would have supplied a firmer base. E.g., *O'Connor v. Ortega*, — U.S. —, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987); *Colorado v. Bertine*, — U.S. —, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). See also *McDonell v. Hunter*, 809 F.2d 1302 (8th Cir.1987), and *Shoemaker v. Handel*, 795 F.2d 1136 (3d Cir.1986), both sustaining administrative searches that were supported entirely by regulations. The fourth amendment does not allow administrative officials to issue warrants but is otherwise silent on who makes policy for Illinois concerning administrative searches. *Illinois v. Krull*, — U.S. —, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), holds that evidence gathered under authority of a state statute later declared unconstitutional may be used in a criminal case, but this is based on considerations peculiar to the exclusion-

ary rule rather than on a belief that legislation is better than a regulation at declaring the policy of Illinois about the propriety of administrative searches. State regulations and state statutes should have equal weight when the question is: "what does society believe is a 'reasonable' administrative search?".

At all events, the searches of the backstretchers' persons at the track are authorized by *both* statute and regulation; the track (outside the backstretchers' cubicles) is a place of business of the licensee, so the regulation is authorized even on the panel's treatment of § 37–9(c). This search has all the support the State of Illinois as a whole can furnish. The court has necessarily declared § 37–9(c) unconstitutional as applied to personal searches at the track.

3. The backstretchers were required to consent to searches as a condition of their employment. The panel's approach to these consents is to say that because the state cannot search the backstretchers' cubicles or persons against their will, the state cannot require consent either. This has the curious consequence that consent is valid whenever it is not needed (because the state may conduct the search without consent) and invalid whenever it is necessary (because the state is forbidden to search over objection). This eliminates consent as a ground for search.

Although the panel does not articulate its rationale, it must be making an "unconstitutional conditions" argument. The state did not ask for consent, as in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). It made consent a condition of employment. "Consent" extracted by threat of a violation of one's constitutional rights is not effective; it is no different from the proposal "your money or your life", because either option makes the person worse off. Another panel of the court recently held that "consent" extracted by a threat of disbarment is valid, see *Lewis v. Lane*, 816 F.2d 1165, 1169 (7th Cir.1987), and I wonder how these decisions may be reconciled, but that is not my principal concern.

Ours is not a simple "unconstitutional condition". The panel did not hold that administrative searches of backstretchers' quarters and persons always violate the fourth amendment. It has held only that the searches are unauthorized by statute and that the regulations are (so far) insufficiently detailed. There has never been a doctrine of "unstatutory conditions" or "insufficiently circumscribed regulatory conditions". Why can't people be asked to consent to a kind of search that the statute has not yet authorized?

Moreover, the state demands consent only from those who live or work at the track. Employees are free to live elsewhere and avoid searches of their quarters. This is one of the grounds on which courts sustain airport searches: you can't board a plane without consenting to a search, but you can travel by car or train if you like. So too at the track. The demand is not unconditional; the employee controls the security of his quarters by his choice of abode. The panel's decision casts a pall over all consents in which the choice is genuine because the person has a right to say no by choosing another line of work, another place to live, a different mode of travel, and so on.

Some recent cases call the unconstitutional conditions doctrine itself into question. *Snepp v. United States*, 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 765 n. 3, 62 L.Ed.2d 704 (1980), holds that an employee may surrender by contract his first amendment right to speak; the Court did not think it important that the consent was required as a condition of employment. *Buckley v. Valeo*, 424 U.S. 1, 54–58 & n. 62, 96 S.Ct. 612, 651–53 & n. 62, 46 L.Ed.2d 659 (1976), holds that the government may condition monetary support for political campaigns on a surrender of the constitutional right to spend unlimited sums for speech. *Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico*, —— U.S. ——, 106 S.Ct. 2968, 2979, 92 L.Ed.2d 266 (1986), uses the principle that the greater power (to ban gambling) includes the lesser power (to condition a gambling permit on surrender of some first amendment rights). "The greater power includes the lesser" is the traditional antagonist of the "unconstitutional conditions" principle. An inferior federal court may not proceed as if the doctrine of unconstitutional conditions were in perfect health.

Neither the panel's proposition that consent is ineffectual when the government lacks the power to impose its will over objection, nor the contrasting view of *Lewis* that knuckling under to a show of authority is voluntary, is very attractive. To determine whether acquiescence in the face of a demand is significant, we must evaluate the nature and strength of the reasons for the demand (as the Supreme Court did in *Snepp*), the options open to the person faced with the demand (here to obtain quarters off the track's premises or to change jobs), the extent to which the scope of any consent is reasonable in light of the purposes to be served, and so on. Many cases say that the government may demand consent when it has strong reasons. The airport search cases are good examples. Searches at race tracks also vindicate important interests. The panel did not deny that the government has a substantial interest in keeping drugs away from horses (and jockeys, see *Shoemaker*, 795 F.2d at 1141–43); it apparently did not believe that the strength of the state's interest is relevant. When there are strong reasons for conducting a search, when the demand affects only a tiny portion of the jobs available in the state (so that saying no and changing jobs is a real option), when the consent approves a search that fits the need like a glove—in short, in this case—the state may use the consent even if it may not act over objection.

If the backstretchers' consents are valid, then the state may carry out its searches even if the Board's regulations do not sufficiently confine the agents' discretion. And if these regulations are inconsistent with the fourth amendment, our court ought to give the right reasons for that conclusion. The panel's opinion does not give Illinois the deference in the interpretation of state law that is its due, and the panel's preference for legislation over regulation requires the state to conform its governance

to the panel's views of how states ought to be organized. The questions of principle glossed over by the panel's opinion are far more important than the outcome of this case, and they are worth the extra judicial time necessary to get them right.